**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CORALYS NEGRON and | : | |
| FRANCISCO NEGRON, | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:17-CV-00583 (JCH) |
| | : | |
| v. | : | |
| | : | |
| PATRIOT AUTO SALES, LLC and | : | MAY 7, 2019 |
| JASON WINER, | : | |
| Defendants. | : | |

**BENCH TRIAL RULING & RENEWED MOTION FOR JUDGMENT (DOC. NO. 85)**

**I.    INTRODUCTION**

The plaintiffs, Coralys Negron ("Coralys") and Francisco Negron ("Francisco")

(collectively, "the plaintiffs"), filed this action against the defendants, Patriot Auto Sales,

LLC ("Patriot") and Jason Winer ("Winer"), in connection with the sale of a used car.

See generally Complaint ("Compl.") (Doc. No. 1).  The plaintiffs claim that the

defendants violated the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et. seq.  See

Amended Complaint ("Am. Compl.") (Doc. No. 32) at 1 ¶ 1.  They also bring claims

under Connecticut law for breach of the implied warranty of merchantability, breach of

express warranty, violations of Connecticut's Retail Installment Sales Finance Act

("RISFA"), civil forgery, and violations of Connecticut's Unfair Trade Practices Act

("CUTPA").  See Am. Compl. at 7-11.  While Winer timely filed an Answer (Doc. No. 12)

to the Complaint, Patriot has defaulted for failing to appear in this case.  Order Granting

Default Entry (Doc. No. 10).  On April 11, 2019, the court held a bench trial and oral

argument in this matter.  On May 6, 2019, the plaintiffs moved for default judgment

against Patriot.  Renewed Motion for Judgment ("Mot. for Default J.") (Doc. No. 85).

1

II.    **PROCEDURAL HISTORY**

The plaintiffs filed a Complaint against the defendants on April 10, 2017.  See generally Compl.  Winer timely filed an Answer (Doc. No. 12) to the Complaint.  Patriot, however, has not made an appearance in this case.  The court therefore granted the plaintiffs' Motion for Default Entry as to Patriot on May 11, 2017.  See Order Granting Default Entry (Doc. No. 10).  On June 9, 2017, the plaintiffs moved for default judgment against Patriot.  See Motion for Judgment (Doc. No. 14).  The court denied this Motion without prejudice to renewal after liability against Winer, the non-defaulting defendant, had been resolved.  See Order Re: Motion for Judgment (Doc. No. 17).

On October 26, 2017, the plaintiffs amended their Complaint to add a claim of civil forgery against Winer.  See Am. Compl. at 10 ¶¶ 40, 41.  On November 20, however, the parties reported that the action had been settled.  See Order of Dismissal (Doc. No. 45).  In light of this development, the court administratively closed the case without prejudice to reopening on or before February 20, 2018.  Id.  On February 16, 2018, the parties requested that the deadline for reopening the case be extended in order to provide Winer with more time to pay the plaintiffs the agreed upon settlement amount.  See Motion to Open Order of Dismissal (Doc. No. 47).  Several such extensions were given to Winer.  See, e.g., Order (Doc. No. 50) (extending payment deadline to May 9); Order (Doc. No. 53) (extending payment deadline to May 29).  However, when Winer still had not tendered the full settlement amount to the plaintiffs by July 27, 2018, the court reopened the case.  See Order Granting Motion to Reopen (Doc. No. 60).

After denying Winer's Motion to Dismiss and Motion for Summary Judgment, see generally Ruling Re: Motion to Dismiss & Motion for Summary Judgment (Doc. No. 69),

2

the court held a one-day bench trial, where it heard the testimony of Coralys Negron

and Francisco Negron.  Both parties also introduced a number of exhibits into the

record.  See Marked Exhibit and Witness List (Doc. No. 83).  On May 6, 2019, the

plaintiffs renewed their Motion for Default Judgment against Patriot.  See generally Mot.

for Default J.

### III.   FINDINGS OF FACT[1]

In 2016, Coralys Negron saw a Facebook post advertising the sale of a 2008

Subaru WRX ("the Vehicle") for $8,500.  The advertisement was posted on the

Facebook page of Brendan Smith ("Smith"), a co-worker of Coralys and the son of

Winer's girlfriend at the time.  Smith's Facebook post, which included a photograph of

the Vehicle, indicated that Winer was selling the Vehicle at one of his lots.

Coralys, who had been looking to purchase a car with all wheel drive, reached

out to Smith about the Vehicle.  Smith, in turn, gave her the contact information of

Patriot Auto Sales, a car dealership based in Connecticut.  When Coralys called Patriot,

she spoke with Winer, who represented himself as the owner of Patriot.  At that time,

Patriot and Winer had an arrangement whereby Winer would operate one of Patriot's

car dealerships ostensibly as Patriot.  Patriot permitted Winer to operate the dealership

under Patriot's name and license even though it knew that Winer was not licensed to

operate a motor vehicle dealership.

---

[1] The court's findings of fact are based on a review of all the evidence, including exhibits and the witnesses' testimony at trial.  They also incorporate the factual allegations in the Amended Complaint that were admitted by Winer in his Answer.  See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation.").  The court has sought to separate out its findings of facts from its conclusions of law.  However, there may be occasions when findings of fact are intertwined with the legal discussion in the Conclusions of Law section of this Ruling.

Coralys met with Winer at Patriot's dealership in Bridgeport, Connecticut, in late October 2016.  Winer showed Coralys the Vehicle.  The same price that Coralys had seen on the Facebook advertisement ($8,500) was also written in marker on the windshield of the Vehicle.  Winer never suggested to Coralys that the Vehicle's cash price would be anything other than $8,500.

Coralys told Winer that, while she did not care how the Vehicle looked on the outside, she wanted a car with a good engine that ran well.  Winer assured her that the Vehicle was working great and had no performance issues.

Based on these representations, Coralys agreed to purchase the Vehicle.  She gave Winer a $2,000 down payment, and she completed a credit application to finance the balance of the purchase price.  Coralys also signed a Purchase Order for the Vehicle, dated October 27, 2016.  This Purchase Order, which was prepared by Winer, noted that Coralys had made a $2,000 down payment on the Vehicle.  However, it set the cash price for the Vehicle at $8,995, not $8,500.  Coralys did not notice this price difference when she signed the Purchase Order.  Winer gave Coralys a copy of the signed Purchase Order for her records.  See Plaintiffs' Exhibit 2 ("Pls.' Ex. 2) (Coralys's copy of the Purchase Order).

Shortly thereafter, Winer met Coralys at her home to sign the paperwork for a retail installment contract with Patriot Auto Sales to finance the remainder of the Vehicle's purchase price.  Coralys's brother, Francisco, acted as a co-signer on the loan.  The retail installment contract listed the Vehicle's sales tax as $590.17 and its post-tax cash price as $9585.17, implying a pre-tax cash price of $8,995.  See Plaintiffs' Exhibit 3 ("Pls.' Ex. 3) (copy of the retail installment contract).  Although Coralys had

4

paid Winer a $2,000 down payment on the Vehicle, the contract noted that the plaintiffs had only paid a $1,000 down payment on the Vehicle. The contract also contained other fees and charges that Winer had never discussed with Coralys or Francisco, including a $399 charge for "VSI" and a $299 "Doc Fee." The total amount financed under the contract was $9,423.17, which amount was to be paid in 40 monthly installments.

At trial, the plaintiffs testified that Winer did not review this paperwork with them in any detail, but instead merely pointed to where the plaintiffs needed to sign. Coralys testified that she did not look closely at the numbers because she and Winer had already discussed the purchase price. As a result, the plaintiffs claim that they did not notice the additional charges and fees or that the pre-tax cash price for the Vehicle ($8,955) was higher than the Vehicle's advertised cash price ($8,500). Winer did not give Coralys or Francisco a copy of the retail installment contract after they signed it.

This contract was later assigned to United Consumer Finance ("UCF"). In connection with the assignment, the defendants sent UCF a copy of the Purchase Order, a consumer loan application, and an automatic loan payment authorization form. At trial, Coralys testified that her signature and initials had been forged in various places on these documents, and that she had never authorized Winer or anyone else to execute these documents on her behalf. The court finds Coralys's testimony to be credible, especially in light of the fact that the signatures that Coralys identified as forged in these documents differ noticeably from the signatures that Coralys identified as her own.

The record also reveals important differences between the version of the Purchase Order that UCF received and the copy of the Purchase Order that was given to Coralys, the most salient of which pertains to the Purchase Order's "as is" disclaimer. Specifically, both copies of the Purchase Order contain the following provision:

> ☐ **"AS IS"** THIS VEHICLE SOLD "AS IS".  THIS MEANS THAT YOU WILL LOSE YOUR IMPLIED WARRANTIES.  YOU WILL HAVE TO PAY FOR ANY REPAIRS NEEDED AFTER SALE IF WE HAVE MADE ANY PROMISES TO YOU, THE LAW SAYS WE MUST KEEP THEM EVEN IF WE SELL "AS IS".  TO PROTECT YOURSELF, ASK US (1) TO PUT ALL PROMISES INTO WRITING AND (2) IF WE OFFER A WARRANTY ON THIS VEHICLE.  CONSUMER SIGNATURE: _____.

In UCF's copy of the Purchase Order, the box is checked and there is a signature on the "Consumer Signature" line.  <u>See</u> Plaintiffs' Exhibit 4 ("Pls.' Ex. 4").  In Coralys's copy, there is no check mark and the signature line is left blank.  <u>See</u> Pls.' Ex. 2.  Based on this evidence, and crediting Coralys's testimony, the court finds that Coralys's signatures were forged and that Coralys never signed the Purchase Order's "as is" disclaimer.

Coralys began experiencing problems with the Vehicle almost immediately after taking possession.  Approximately one week after delivery, she brought the Vehicle to a friend, who was a car mechanic, for inspection.  The mechanic discovered that there was no oil in the Vehicle.  Coralys called Winer and told him that the Vehicle already needed an oil change.  Winer responded that it was impossible that the Vehicle could be out of oil because he had changed the oil just prior to giving her the Vehicle.  Winer told Coralys to refill the oil and recheck the Vehicle's oil levels in a week.  Coralys followed these instructions.  A week later, however, she discovered that the Vehicle's oil levels were once again very low.

When Coralys informed Winer of the Vehicle's continuing oil problems, Winer stated that he would have someone look into the problem and fix the Vehicle.  However, Winer never arranged to have the Vehicle inspected.  Instead, after further phone calls from Coralys, Winer recommended that she take the Vehicle to a Subaru dealership for inspection.  Coralys followed this advice and brought her car to the Dan Perkins Subaru Dealership in Milford, Connecticut (the "Subaru Dealership").  The inspection, which cost Coralys $132.89, found that the Vehicle's oil feed line was leaking, the engine was making a "knocking noise," the Vehicle's struts were leaking, and the AC needed to be replaced.  See Plaintiffs' Exhibit 8 ("Pls.' Ex. 8) (invoice from Subaru Dealership).  The Subaru Dealership estimated that it would cost Coralys $6,700 to make the repairs.

When Coralys relayed the results of this inspection to Winer, Winer said that it was normal for Subaru cars to run out of oil quickly.  Upon hearing this, Coralys told Winer that she wanted to return the Vehicle in exchange for her money back.  In response, Winer said that he would call UCF to inquire whether they could unravel the transaction.  Winer, however, did not follow up with Coralys about the matter, and he stopped responding to Coralys's phone calls.

When Coralys eventually did reach Winer, he acted as if he were hearing about the Vehicle's problems for the first time.  At that point, Coralys called her attorney, who, in turn, sent a letter to Patriot and UCF on March 9, 2017, informing them that the plaintiffs had revoked their acceptance of the Vehicle due to breaches of warranty or, in the alternative, were rescinding the retail installment contract due to violations of the Retail Installment Sales Finance Act.  See Plaintiffs' Exhibit 9 ("Pls.' Ex. 9) (notice of revocation and rescission).  The letter also provided the Vehicle's location and informed

7

UCF and Patriot that they could pick up the Vehicle at their convenience.  Soon after the plaintiffs sent the letter, UCF retrieved the Vehicle.

On April 10, 2017, the plaintiffs and UCF entered into a settlement agreement (the "UCF Settlement Agreement").  Under this Agreement, the parties canceled the retail installment contract, UCF paid the plaintiffs $2,000, and the parties agreed not to bring legal claims against each other in connection with the Vehicle.  See Plaintiffs' Exhibit 11 ("Pls. Ex. 11") (copy of the UCF Settlement Agreement).

## IV.   CONCLUSIONS OF LAW

The plaintiffs bring the following claims against Winer: (1) violations of the Truth in Lending Act ("TILA"); (2) breach of the implied warranty of merchantability; (3) breach of express warranty; (4) violations of Connecticut's Retail Installment Sales Finance Act ("RISFA"); (5) civil forgery; and (6) violations of Connecticut's Unfair Trade Practices Act ("CUTPA").  See Am. Compl. at 6-11.  The plaintiffs assert the same causes of action against Patriot, except for the civil forgery claim.  See id.  In his Answer to the Amended Complaint (Doc. No. 74) at 6, Winer raises a single jurisdictional defense, namely: that the court lacks subject matter jurisdiction over the claims against Winer because Winer does not qualify as a "creditor" under TILA.

The court will first address Winer's jurisdictional defense.  Because the court will find that it has subject matter jurisdiction over this case, it will proceed to address whether the plaintiffs have satisfied their burden with respect to their claims against Winer.  Next, it will address whether default judgment should be entered against Patriot.  Finally, the court will turn to the issue of damages.

A.     Jurisdictional Defense

The plaintiffs invoke the court's subject matter jurisdiction pursuant to section 1640 of title 15 of the United States Code, TILA's jurisdiction-granting provision.  Am. Compl. at 2 ¶ 6.  Winer argues that the plaintiffs' TILA claim, which claim alleges that Winer violated certain disclosure requirements, fails because Winer does not satisfy TILA's definition of a "creditor."  Because TILA is the only asserted basis for invoking federal question jurisdiction, Winer contends that the court lacks subject matter jurisdiction to decide any of the plaintiffs' claims against him.[2]

The court will address Winer's jurisdictional defense in two parts.  First, it will determine whether Winer qualifies as a creditor under TILA.  Finding that Winer does not satisfy TILA's creditor requirement, the court will next consider whether this requirement is a jurisdictional limitation or a substantive element of a TILA cause of action.

1.     TILA's Creditor Requirement

As the plaintiffs acknowledged at trial, TILA's disclosure requirements only apply to "a creditor or lessor."  15 U.S.C. § 1631(a) ("[A] creditor or lessor shall disclose to the person who is obligated on a consumer lease or a consumer credit transaction the information required under this subchapter."); see also Milord v. Duran, No. 13-CV-5451 KAM, 2013 WL 5592622, at *3 (E.D.N.Y. Oct. 10, 2013) ("[T]he general disclosure requirements under TILA [apply] only to a 'creditor or lessor.'").  The statute defines a "creditor" as "a person who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments . . . and (2) is the person to whom

---

[2] The plaintiffs do not assert that the court has diversity jurisdiction.

the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement."  15 U.S.C. § 1602(g).  The Federal Reserve Board has elaborated on the definition of "creditor" in Regulation Z, 12 C.F.R. § 226.2.  Most relevant to this case, Regulation Z provides that "[a] person regularly extends consumer credit only if it extended credit . . . more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year."  12 C.F.R. § 226.2(a)(17)(v); see also Riethman v. Berry, 287 F.3d 274, 279 (3d Cir. 2002) ("[T]he Federal Reserve's TILA regulation specifically defines the TILA statutory term 'regularly' as extending credit within the last twelve months 'more than 25 times.'") (internal citations omitted); Milord, 2013 WL 5592622, at *3 (same).

The plaintiffs acknowledged at trial that they did not have evidence that Winer engaged in more than 25 finance transactions in 2015, the year preceding the sale of the Vehicle to the plaintiffs.  However, they suggested that TILA's disclosure requirements still applied to Winer because Patriot qualified as a TILA creditor.  Although the plaintiffs did not introduce evidence at trial showing that Patriot engaged in the requisite number of credit extensions, they noted (1) that their Complaint alleged that "Patriot Auto was a 'Creditor' within the meaning of [TILA]," Compl. at 5 ¶ 33; and (2) that Patriot admitted this allegation when it defaulted.  However, Winer did not admit this allegation in his Answer.  See Answer at 4.

It is true that "a defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint."  City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) (internal quotation marks omitted).  However, it is

equally well established that a non-defaulting defendant is not bound by the facts deemed admitted by a defaulting co-defendant. See The Mary, 13 U.S. (9 Cranch) 126, 143 (1815) (Marshall, C.J.) ("In the same cause, a fact, not controverted by one party, who does not appear, and therefore, as to him taken for confessed, ought not, on that implied admission, to be brought to bear upon another who does appear, does controvert, and does disprove it.") (emphasis in original); see also Donahue v. Glob. Home Loans & Fin. Inc., No. 05 CIV. 8362 (RJS), 2010 WL 11586675, at *1 (S.D.N.Y. Jan. 13, 2010) ("While it is ancient learning that a default judgment deems all the well-pleaded allegations in the pleadings to be admitted, the default judgment entered against [the defaulting defendant] does not operate as an admission by [the non-defaulting defendant], who has appeared in and defended this lawsuit.") (internal quotation marks and citations omitted).  Thus, because Winer did not, himself, admit the Complaint's allegations that Patriot qualified as a TILA creditor, those allegations cannot be used to establish Winer's liability.  Accordingly, the TILA claim against Winer fails because there is no basis in the record for concluding that Winer is a creditor within the meaning of TILA.

## 2.   Jurisdiction

Having concluded that Winer does not qualify as a TILA creditor, the court must next consider whether TILA's creditor requirement is a jurisdictional limitation or a substantive element of a TILA cause of action.  If the TILA creditor requirement is jurisdictional, then this court must dismiss the entire action against Winer, as it would not have the authority to exercise supplemental jurisdiction over the plaintiffs' remaining state claims.  See Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the

complaint in its entirety."); In re Joint Eastern and Southern Dist. Asbestos Litig., 14

F.3d 726, 730 n.2 (2d Cir.1993) ("[T]he court may not exercise supplemental jurisdiction

over claims unless the court has 'original jurisdiction' over at least one of the plaintiff's

claims.").  On the other hand, if TILA's creditor requirement merely "delineates a

substantive ingredient of a [TILA] claim for relief," the plaintiffs' failure to prove that

Winer is a "creditor" under TILA does not deprive the court of subject matter jurisdiction,

and the court therefore "generally retains discretion to exercise supplemental

jurisdiction" over the plaintiffs' state claims.  Arbaugh, 546 U.S. at 503, 514.

The Supreme Court has developed a clear statement rule for whether "a

statutory prerequisite to suit" is a jurisdictional or an element of the claim:

> If the Legislature clearly states that a threshold limitation on a statute's
> scope shall count as jurisdictional, then courts and litigants will be duly
> instructed and will not be left to wrestle with the issue.  But when Congress
> does not rank a statutory limitation on  coverage as jurisdictional, courts
> should treat the restriction as nonjurisdictional in character.

Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 160–61 (2010) (quoting Arbaugh, 546

U.S. at 515–516).  As the Second Circuit has explained, this "bright-line test" does not

require "Congress [to] use magic words to speak clearly."  City of New York v. Mickalis

Pawn Shop, LLC, 645 F.3d 114, 126 (2d Cir. 2011) (internal quotation marks and

alterations omitted).  However, "Congress must provide a clear indication that it wants a

rule to be jurisdictional before [courts] may recognize it as being jurisdictional," and

"even rules that are important and mandatory should not be given jurisdictional brand

unless Congress has clearly indicated otherwise."  Id. at 126-27 (internal quotation

marks, citations, and alterations omitted).

Applying <u>Arbaugh</u>'s bright-line test to the TILA provisions at issue in this case, the court concludes that the plaintiffs' failure to prove that Winer is a "creditor" under TILA does not deprive this court of subject matter jurisdiction.  In setting forth the requirements of a TILA creditor, section 1602(g) of title 15 of the United States Code "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts."  <u>Mickalis</u>, 645 F.3d at 127 (internal quotation marks and alterations omitted). Instead, section 1602(g) merely provides that a "creditor" is "a person who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments . . . and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement."  15 U.S.C. § 1602(g).  Thus, as with other statutory provisions that have been found by courts to be nonjurisdictional, section 1602(g) "contains no explicit reference to its [creditor] requirements being jurisdictional in nature and never uses the word 'jurisdiction.'"  <u>In re Zarnel</u>, 619 F.3d 156, 168–69 (2d Cir. 2010) (holding that certain requirements in the bankruptcy code are nonjurisdictional).  TILA's "structure" further indicates that "Congress [did] not rank [this] statutory limitation on coverage as jurisdictional" because TILA's creditor requirement is located in a provision "separate" from TILA's "jurisdiction-granting section."  <u>Reed Elsevier</u>, 559 U.S. at 160-162, 164, 166 (holding that the Copyright Act's registration requirement, which was located in a provision "separate" from the Act's jurisdiction-granting provision, was nonjurisdictional); <u>Arbaugh</u>, 546 U.S. at 515-16 (applying the same structural analysis to Title VII's employee numerosity requirement).  As a result, the court concludes that Congress did not clearly state that TILA's creditor requirements

13

are jurisdictional.[3]  The court therefore has subject matter jurisdiction over the plaintiffs'

claims against Winer, notwithstanding its conclusion that the Winer is not a creditor

within the meaning of TILA.

Furthermore, the court will exercise supplemental jurisdiction over the plaintiffs'

state law claims, which claims stem from the "same 'common nucleus of operative fact'"

that underpin the plaintiffs' TILA claim.  Montefiore Med. Ctr. v. Teamsters Local 272,

642 F.3d 321, 332 (2d Cir. 2011) (quoting United Mine Workers v. Gibbs, 383 U.S. 715,

725 (1966)).  Where, as here, "a federal court dismisses all claims over which it had

original jurisdiction, it must reassess its jurisdiction over the case by considering several

related factors – judicial economy, convenience, fairness, and comity."  Motorola Credit

Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004).  "In the usual case in which all federal-

law claims are eliminated before trial, the balance of [these] factors . . . will point toward

declining to exercise jurisdiction over the remaining state-law claims."  DiLaura v. Power

Auth. of State of N.Y., 982 F.2d 73, 80 (2d Cir. 1992).  However, the Second Circuit has

also "held that when the dismissal of the federal claim occurs late in the action, after

there has been substantial expenditure in time, effort, and money in preparing the

dependent claims, knocking them down with a belated rejection of supplemental

jurisdiction may not be fair.  Nor is it by any means necessary."  Motorola Credit, 388

F.3d at 56 (internal quotation marks omitted).

---

[3] Some district courts in this Circuit have dismissed TILA claims for lack of subject matter jurisdiction when the complaint did not plausibly allege that the defendant was a creditor within the meaning of TILA.  See, e.g., Carlson v. Raymour & Flanigan Furniture Co., No. 10-CV-455A, 2011 WL 1454068, at *6 (W.D.N.Y. Mar. 24, 2011).  However, these opinions are perhaps best described as "drive-by jurisdictional rulings that should be accorded no precedential effect" because do not "explicitly consider[ ] whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim."  Arbaugh, 546 U.S. at 511 (internal quotation marks omitted).

The particular circumstances of this case weigh heavily in favor of exercising supplemental jurisdiction. Although Winer could have challenged the plaintiffs' TILA claim in his previous Motion to Dismiss or Motion for Summary Judgment, he chose to wait until trial to seek dismissal of the plaintiffs' sole federal cause of action. As a result of this delay, the court has invested significant judicial resources in familiarizing itself with the facts and legal issues in this case, addressing Winer's previous dispositive motions, and conducting a trial on the merits. See Motorola Credit, 388 F.3d at 56 (observing that "it would have stood judicial economy on its head not to proceed with the state claims" where "the Court ha[d] not only spent considerable time dealing with the legal issues and becoming fully conversant with the facts but also ha[d] conducted a trial on the merits.") (internal quotation marks omitted, emphasis in original). The parties have also dedicated considerable time and energy towards briefing Winer's two dispositive motions and preparing for trial. Given the late stage of this litigation, the court finds that requiring the plaintiffs to refile their claims in state court would create needless inconvenience and cost in a case that has already dragged on for more than two years. Nor would declining to exercise supplemental jurisdiction promote fairness to the litigants. As noted above, Winer has already delayed the resolution of the plaintiffs' lawsuit by first agreeing to settle and then failing to tender the agreed-upon settlement amount. See, supra, at 2. To further delay this case based on "a belated rejection of supplemental jurisdiction" would unfairly prejudice the plaintiffs. Motorola Credit, 388 F.3d at 56. Finally, while the court is mindful of the Second Circuit's instructions to avoid "[n]eedless decisions of state law," Seabrook v. Jacobson, 153 F.3d 70, 72 (2d Cir. 1998), the comity-based concerns about exercising supplemental

jurisdiction are less pronounced where, as here, the state causes of action do not

"require the district court to resolve any novel or unsettled issues of state law," Mauro v.

S. New England Telecommunications, Inc., 208 F.3d 384, 388 (2d Cir. 2000).  Thus, in

light of these considerations, the court retains supplemental jurisdiction over the

plaintiffs' remaining state claims against Winer.

      B.    <u>State Claims against Winer</u>

      The court will now consider the plaintiffs' state law claims against Winer for (1)

civil forgery, (2) breach of the implied warranty of merchantability, (3) breach of express

warranty, (4) violation of RISFA, and (5) violation of CUTPA.

      1.    Civil Forgery

      The plaintiffs claim that Winer is liable for civil forgery pursuant to section 52-565

of the Connecticut General Statutes.  Am. Compl. at 10 ¶¶ 40-41.  This statutory

provision provides that "[a]ny person who falsely makes, alters, forges or counterfeits

any document, or knowingly utters, as true, any document falsely made, altered, forged

or counterfeited, shall pay double damages to any party injured thereby."  Conn. Gen.

Stat. § 52-565.  To prevail on such a claim, a plaintiff must not only show that the

challenged document was forged or altered without his authorization, but that the

defendant was the one who committed the forgery.  See Aksomitas v. Aksomitas, 205

Conn. 93, 102 (1987) ("[I]n order to recover damages under § 52-565, the plaintiff must

have proved that the defendant either had forged the challenged documents or had

knowingly uttered, as true, the forged documents."); Kasper v. G & J P'ship, No.

FSTCV075004956S, 2011 WL 7049484, at *19 (Conn. Super. Ct. Dec. 23, 2011)

(finding for the defendant where the plaintiff had "failed to sustain her burden of proof by

a preponderance of the evidence that [the defendant] was the person who [had] forged

[the plaintiff's] signature"); <u>Lettman v. Lovett</u>, No. CV156062936S, 2018 WL 3966706, at

*3 (Conn. Super. Ct. Aug. 1, 2018) (finding for the defendant where "[t]he plaintiff ha[d]

not provided any credible evidence that if the documents were forged or altered that it

was the defendant who did so").

In this case, the plaintiffs have proven by a preponderance of the evidence that

their signatures were forged on several documents. <u>See</u>, <u>supra</u>, at 5-6.  However, they

have not carried their burden of showing that Winer was the party who committed the

forgery.  Indeed, Coralys acknowledged at trial that she did not know who signed her

name on these documents.  The plaintiffs have not come forward with evidence

suggesting that Winer was the only person to handle these documents, or that the

forged signatures match Winer's handwriting.  Although there is no dispute that Winer

was involved in the processing of the plaintiffs' finance application, that involvement

alone does not establish by a preponderance of the evidence that Winer committed or

directed the forgery.  Accordingly, the court finds that the plaintiffs are not entitled to the

"extraordinary" remedy of double damages under section 52-565 of the Connecticut

General Statutes.  <u>Aksomitas</u>, 205 Conn. at 102.

> 2.      Breach of the Implied Warranty of Merchantability

The plaintiffs sue Winer under section 42a-2-314 of the Connecticut General

Statutes for breach of the implied warranty of merchantability.  Am. Compl. at 7 ¶ 45.

Under Connecticut law, "[a] warranty of merchantability is implied in any sale of goods

by a merchant seller."  <u>Schenck v. Pelkey</u>, 176 Conn. 245, 254 (1978).  The statute

defines a "merchant" as a person (1) "who deals in goods of the kind" at issue in the

challenged transaction; (2) who "otherwise by his occupation holds himself out as

having knowledge or skill peculiar to the practices or goods involved in the transaction;"

or (3) "to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."  Conn. Gen. Stat. § 42a-2-104(1).  "[T]he statutory standards for merchantability include . . . that the goods be fit for the ordinary purposes for which such goods are used."  Schenck, 176 Conn. at 254 (internal quotation marks omitted); see also Criscuolo v. Mauro Motors, Inc., 58 Conn. App. 537, 545 (2000) (same).  The ordinary purpose of motor vehicles is "normal and reliable driving."  Alexis v. PMM Enterprises LLC, No. 3:17-CV-1622 (MPS), 2018 WL 5456491, at *4 (D. Conn. Oct. 29, 2018); James v. Lopez Motors, LLC, No. 3:16-CV-835 (VLB), 2018 WL 1582552, at *5 (D. Conn. Mar. 31, 2018).  To a prevail on a claim for breach of the implied warranty of merchantability, a plaintiff must also give notice to the seller of the claimed breach.  See Gallinari v. Kloth, 148 F. Supp. 3d 202, 215 (D. Conn. 2015) (requiring that notice be given to the seller); Nassar v. Wiz Leasing, Inc., No. NNHCV126033894S, 2013 WL 4734851, at *4 (Conn. Super. Ct. Aug. 12, 2013) (same).

   The plaintiffs in this case have carried their burden of proof with respect to each element of their claim for breach of the implied warranty of merchantability.  To begin, the court finds that Winer is a "merchant" because, at the time when the plaintiffs purchased the Vehicle, Winer operated a car dealership and acted as its owner.  The court further finds that the Vehicle "fail[ed] to conform to the ordinary purpose for which [cars] are supposed to be used."  Criscuolo, 58 Conn. App. at 545-46.  As documented above, the Vehicle required oil changes on a weekly basis, far more frequently than an ordinary vehicle owner would expect.  See, supra, at 6-7.  Further investigation revealed that the Vehicle's oil feed line was leaking oil, the engine was making concerning

18

noises, the Vehicle's struts were leaking, and the AC needed to be replaced.  Coralys, in turn, promptly notified Winer of the Vehicle's mechanical problems.  As a result, the court concludes not only that the Vehicle was unfit for normal and reliable driving at the time of the sale,[4] but that the plaintiffs satisfied the notice requirement of a claim for breach of the implied warranty of merchantability.

At trial, Winer argued that he is not liable for breach of the implied warranty of merchantability because he disclaimed the Vehicle's implied warranty pursuant to section 42-224 of the Connecticut General Statutes.  Under this statutory provision, a dealer may waive implied warranties as to certain types of used cars by including in the sales contract an "as is" disclaimer.[5]  See Johnson v. Rd. Ready Used Cars, Inc., No. 3:15-CV-00271-WWE, 2016 WL 5339571, at *1 (D. Conn. Sept. 22, 2016) (providing a detailed overview of section 42-224).

The plaintiffs do not dispute that the Purchase Order for the Vehicle contains an "as is" disclaimer that conforms to the requirements of section 42-224.  However, Coralys testified that she never signed or otherwise agreed to the "as is" disclaimer. Her testimony is bolstered by the fact that the copy of the Purchase Order that Winer gave Coralys shows that the box for the "as is" disclaimer was left unchecked and the space for the customer's signature was left unsigned.  See Pls.' Ex. 2.  Although Winer submitted at trial a version of the Purchase Order that had a checked and signed "as is"

---

[4] Although the Subaru Dealership's diagnosis of the Vehicle's mechanical problems came several weeks after the plaintiffs took possession of the car, the court credits Coralys's testimony that she began experiencing problems with the Vehicle shortly after she took possession of it.  The court draws the reasonable inference that these mechanical problems did not arise after the sale of the Vehicle, but rather were present at the time when Coralys took possession of the Vehicle.

[5] Section 42-224 applies to the Vehicle because the Vehicle, a 2008 Subaru model, is "seven years of age or older."  Conn. Gen. Stat. § 42-224(a).

disclaimer, the court credits Coralys's testimony that the check mark and signature were forged.  As a result, the court finds the Winer did not disclaim the Vehicle's implied warranties, and that the plaintiffs have therefore proven their claim against Winer for breach of the implied warranty of merchantability.

          3.       Breach of Express Warranty

The plaintiffs claim that Winer breached an express warranty pursuant to section 42a-2-313 by representing that the Vehicle's engine was in a good condition.  Am Compl. at 8.  This statutory provision provides, in relevant part, that "[a] seller creates an express warranty through 'any affirmation of fact or promise' or 'description of the goods' that becomes part of the basis of the bargain.  <u>Alexis</u>, 2018 WL 5456491, at *4 (quoting Conn. Gen. Stat. § 42a-2-313(1)(a)-(b)).  Statements that are "merely puffing," however, "do not create express warranties."  <u>Web Press Servs. Corp. v. New London Motors, Inc.</u>, 203 Conn. 342, 351 (1987) (internal quotation marks omitted).  While the Connecticut Supreme Court has recognized that "[d]rawing the line between puffing and the creation of a warranty is often difficult,"  it has highlighted two factors that are "helpful in making that determination."  <u>Id.</u> at 352.  The first focuses on "the specificity of the statements made."  <u>Id.</u>  As the Connecticut Supreme Court has explained:

> A statement such as 'this truck will give not less than 15.1 miles to the gallon when it is driven at a steady 60 miles per hour' is more likely to be found to create an express warranty than a statement such as 'this is a top-notch car.'  Statements to the effect that a truck was in 'good condition' and that a motor was in "perfect running order" have been held not to create express warranties.

<u>Id.</u> (internal citations omitted).  The second "factor to be considered in determining whether a statement creates an express warranty is whether it was written or oral, the latter being more likely to be considered puffing."  <u>Id.</u>

In this case, the plaintiffs' claim for breach of express warranty rests on Winer's general verbal assurances to Coralys that the Vehicle was "great," that it was "working fine," and that it had "no issues." Nothing in the record, however, suggests that Winer made more specific representations regarding the quality of the engine or the overall performance of the Vehicle. Nor is there evidence to suggest that Winer's assurances were ever put down in writing. The court therefore finds that Winer's statements about the Vehicle did not create an express warranty, but instead amounted merely to puffing. Accordingly, the plaintiffs' breach of express warranty claim against Winer fails.

### 4. RISFA Violations

The plaintiffs claim that Winer is liable under RISFA because, <u>inter</u> <u>alia</u>, he inaccurately listed the plaintiffs' down payment on the retail installment contract and failed to provide the plaintiffs with a copy of that contract. Am. Compl. at 9 ¶ 36. "RIFSA sets forth the conditions governing retail installment sales contracts under Connecticut law in Conn. Gen. Stat. § 36a-771." <u>James v. Lopez Motors, LLC</u>, No. 3:16-CV-835 (VLB), 2018 WL 1582552, at *4 (D. Conn. Mar. 31, 2018). That section provides:

> Every retail installment contract shall be in writing, shall contain all the agreements of the parties and shall be completed as to all essential provisions prior to the signing of the contract by the retail buyer. No installment contract shall be signed by the retail buyer when such contract contains blank spaces to be filled in except that this provision shall not apply to serial number or other identifying marks which are not available for description at the time of execution of such contract. The retail seller shall deliver to the retail buyer a true and complete executed copy of the retail installment contract at the time the retail buyer signs such contract.

Conn. Gen. Stat. § 36a-771(a). As the Connecticut Supreme Court has explained, "RISFA was adopted to protect retail buyers of goods from unknowingly assuming excessive charges by requiring that all charges and terms be fully set forth by the retail

seller before the contract is signed by the buyer." <u>Barco Auto Leasing Corp. v. House</u>, 202 Conn. 106, 116 (1987) (internal quotation marks omitted).  Accordingly, courts "must construe [RISA] liberally in order to implement its consumer protection policies" and "correct the often gross imbalance in bargaining power between a retail seller and a retail buyer."  <u>Id</u>.  The Connecticut Supreme Court therefore requires "strict compliance" with RISFA, meaning that even inadvertent violations of RISFA's technical requirements will trigger the statute's remedies.  <u>Gaynor v. Union Tr. Co.</u>, 216 Conn. 458, 475 (1990); <u>see</u> <u>also</u> <u>Barco</u>, 202 Conn. at 118 ("Although the plaintiff's violations of RISFA may have been inadvertent, our primary responsibility is to implement the remedial purpose of RISFA, which seeks to furnish a consumer buyer with all the information needed to make an informed choice about whether to enter into a particular transaction."); <u>James</u>, 2018 WL 1582552, at *5 (noting that "a retail buyer is entitled to seek a rescission of a retail instalment contract when the retail seller has not complied with the provisions of section 36a-771(a)," even when the RISFA violation is based on "a technical defect") (internal quotation marks omitted).

In this case, there is no dispute that RISFA's protections apply to the plaintiffs' retail installment contract for the Vehicle.[6]  Winer failed to provide the plaintiffs with copies of the signed retail installment contract.  The court further finds that Winer did not

---

[6] This contract satisfies RISFA's definition of a retail installment contract because it constitutes "an agreement to pay the retail purchase price of [the Vehicle] . . . in installments over a period of time[,] [ ] pursuant to which a security interest . . . is retained or taken by the retail seller for the payment of the amount of such retail installment contract."  Conn. Gen. Stat. Ann. § 36a-770(12).  As a result, the plaintiffs are "retail buyers" within the meaning of the statute, and Winer qualifies as a "retail seller."  <u>See</u> Conn. Gen. Stat. Ann. § 36a-770(11) ("'Retail buyer' means a person who buys or agrees to buy one or more articles of goods from a retail seller not for the purpose of resale or lease to others in the course of business and who executes a retail installment contract or an installment loan contract in connection therewith.); Conn. Gen. Stat. § 36a-770(14) ("'Retail seller' means a person who sells or agrees to sell one or more articles of goods under a retail installment contract to a retail buyer.").

include "all the agreements of the parties" in this contract.  In particular, he listed the

plaintiffs as having made a $1,000 down payment, when, in fact, Coralys gave Winer a

$2,000 down payment.  Accordingly, the court concludes that Winer violated RISFA.

> 5.    CUTPA Violations

Finally, the plaintiffs claim that Winer violated CUTPA.  Am. Compl. at 10 ¶ 42.

To establish a CUTPA violation, a plaintiff must show that the defendant engaged in

"unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn.

Gen. Stat. § 42-110b(a).  To determine whether a practice is unfair or deceptive, courts

first look to whether the Commissioner of Consumer Protection has promulgated

regulations identifying the practice as a per se violation of CUTPA.  See Conn. Gen.

Stat. Ann. § 42-110b(c) (empowering "[t]he commissioner . . . [to] establish by regulation

acts, practices or methods which shall be deemed to be unfair or deceptive in violation

of subsection (a) of this section").  If no regulation covers the practice in question,

Connecticut courts apply the Federal Trade Commission's "cigarette rule." See Locascio

v. Imports Unlimited, Inc., 309 F. Supp. 2d 267, 271 (D. Conn. 2004) (applying this two-

step framework for analyzing CUTPA claims).  Under this rule, the court considers three

factors:

> (1) Whether the practice, without necessarily having been previously
> considered unlawful, offends public policy as it has been established by
> statutes, the common law, or otherwise – in other words, it is within at least
> the penumbra of some common law, statutory, or other established concept
> of unfairness; (2) whether it is immoral, unethical, oppressive, or
> unscrupulous; (3) whether it causes substantial injury to consumers,
> competitors or other businesspersons.

Edmands v. CUNO, Inc., 277 Conn. 425, 451 n.16 (2006) (internal quotation marks and

alterations omitted).  A plaintiff's CUTPA claim need not satisfy all three criteria to

prevail under the cigarette rule.  Id.  "A practice may be unfair because of the degree to

which it meets one of the criteria or because to a lesser extent it meets all three."  Id.

In this case, the court finds that Winer violated CUTPA by advertising the Vehicle

for $8,500 but selling it to the plaintiffs for a cash price of $8,995.  Section 42-110b-

28(b)(1) of the Connecticut Agencies Regulations makes it a per se violation of CUTPA

for car dealers to sell vehicles for more than their advertised price.  See Emmanuelli v.

Merriam Motors, Inc., No. X04CV020126869S, 2003 WL 22080496, at *2 (Conn. Super.

Ct. Aug. 25, 2003) ("A violation of the cited state regulation, by its very wording, would

be a per se violation of CUTPA.").  This regulation defines an "advertisement" as "any

oral, written or graphic statement made by a new car dealer or used car dealer in any

manner in connection with the solicitation of business and includes, but is not limited to,

statements and representations made in a newspaper or other publication or on radio or

television or contained in any notice, handbill, sign, billboard, poster, bill, circular,

brochure, pamphlet, catalogue or letter."  Conn. Agencies Regs.  42-110b-28(a)(3).

Thus, while the regulation encompasses many different forms of advertisement, its

scope is limited to statements that the car dealers themselves made.  See Conn.

Agencies Regs. §  42-110b-28(a)(3) (defining an "advertisement" as "[a] statement

made by a new car dealer or used car dealer") (emphasis added); see also Valencia v.

Crabtree Imports, Inc., No. X04CV020103613S, 2004 WL 424499, at *2 (Conn. Super.

Ct. Feb. 24, 2004) (finding that the defendant car dealer did not violate section 42-110b-

28(b)(1) because the car manufacturer, not the dealership, was responsible for creating

the advertisement at issue).

It is undisputed that Winer sold the Vehicle to the plaintiffs for a pre-tax, cash price of $8,995.  Coralys testified at trial that, when she visited the Patriot dealership, she saw a price of $8,500 written in marker on the windshield of the Vehicle.  Coralys also testified that Winer never told her that the Vehicle's cash price would be anything other than $8,500.  Crediting this testimony, the court finds that Winer, who operated the Patriot dealership in Bridgeport as its de facto owner at the time, advertised the Vehicle for $8,500.[7]  As a result, the court concludes that Winer violated CUTPA by selling the Vehicle for more than its advertised price.

C.    Claims against Patriot

The court now considers whether to grant the plaintiffs' application for default judgment against Patriot for (1) breach of the implied warranty of merchantability, (2) violation of RISFA, (3) violation of CUTPA, (4) breach of express warranty, and (5) violation of TILA.

Rule 55 of the Federal Rules of Civil Procedure "provides a two-step process for the entry of judgment against a party who fails to defend[.]"  City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 128 (2d Cir. 2011) (internal quotation marks omitted).  "The first step, entry of a default, formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff."  Id.  "The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled[.]"  Id.

---

[7] Because the court finds that the written price on the Vehicle's windshield constitutes an advertising statement made by Winer, it does not reach the contested issue of whether Smith's Facebook advertisement of the Vehicle qualifies as an advertising statement made by Winer.

The entry of default does not automatically entitle the plaintiff to entry of a default judgment; rather, the decision to enter a default judgment is entrusted to the "sound judicial discretion" of the district court. Shah v. New York State Dep't of Civil Serv., 168 F.3d 610, 615 (2d Cir. 1999). In exercising this discretion, courts in this Circuit typically focus on three factors: (1) whether the default was willful, (2) whether denying the application for default would prejudice the movant, and (3) whether a meritorious defense exists.[8] In addition, before entering a default judgment, a district court must determine whether a plaintiff has carried his burden of establishing the defaulting defendant's liability. Mickalis, 645 F.3d at 137. In making this determination, the court must accept as true all well-pleaded factual allegations in a complaint pertaining to liability, and it must draw "all reasonable inferences from the evidence offered" in favor of a plaintiff. Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

Having found that Winer is liable for breach of the implied warranty of merchantability, violation of RISFA, and violation of CUTPA, see, supra, at 19, 22, 24, the court concludes that Patriot is also liable on these claims based on agency principles. In Connecticut, "it is a general rule of agency law that the principal in an

---

[8] These three factors are most often discussed in the context of a motion to vacate an entry of default judgment pursuant to Federal Rule of Civil Procedure 55(c). See, e.g., Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 94, 96 (2d Cir. 1993) ("Because Rule 55(c) does not define the term 'good cause,' we have established three criteria that must be assessed in order to decide whether to relieve a party from default or from a default judgment."). However, the Second Circuit, other district courts in this Circuit, and several treatises have all indicated that these three factors should also guide a district court's decision to grant or deny a motion for default judgment. See Pecarsky v. Galaxiworld.com Ltd., 249 F.3d 167, 170–71 (2d Cir. 2001) (applying these three factors to review an appeal from the entry of a default judgment where no motion to vacate the default judgment was made); Palmieri v. Town of Babylon, 277 F. App'x 72, 74 (2d Cir. 2008) (noting that "[s]imilar factors" apply to a motion for default judgment and a motion to set aside a default under Rule 55(c)); Atl. Recording Corp. v. Brennan, 534 F. Supp. 2d 278, 280-81 (D. Conn. 2008) (reviewing case law and treatises that implicitly or explicitly "link[ ] the question of whether to enter default judgment to the related issue of whether to grant a defaulting party relief under Rules 55(c) or 60(b)").

agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment." Ackerman v. Sobol Family P'ship, LLP, 298 Conn. 495, 508 (2010).  "An agency's authority may be actual or apparent."  Id.  Apparent authority exists when (1) "the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted the agent to act as having such authority;" and (2) the party dealing with the agent reasonably believed in good faith "that the agent had the necessary authority to bind the principal to the agent's action."  Id. at 508-09.

In this case, the Complaint's well-pleaded factual allegations, together with the evidence presented at trial, establish that Winer possessed apparent authority to act on behalf of Patriot.[9]  Specifically, it is alleged that Patriot knowingly permitted Winer to operate one of its car dealerships under Patriot's name and license.  See Compl. at 2 ¶¶10-13.  This authority to manage the car dealership clearly embraces the acts that give rise to the plaintiffs' suit, namely: the advertisement and sale of the Vehicle. Furthermore, Coralys's belief that Winer's actions were binding on Patriot was reasonable in light of Winer's representations to her that he was the owner of Patriot. As a result, Patriot is liable to the plaintiffs for Winer's breach of the implied warranty of merchantability and his violations of RISFA and CUTPA.

However, the plaintiffs have not carried their burden of establishing Patriot's liability with respect to the TILA claim or the breach of express warranty claim.  The

---

[9] Because the plaintiffs amended their original Complaint after the court granted their Motion for Entry of Default as to Patriot Auto Sales, see, supra, at 2, the court relies on the factual allegations in the original Complaint, rather than the Amended Complaint, to determine whether entry of default judgment against Patriot Auto Sales is warranted.

plaintiffs failed to prove these claims against Winer, see, supra, at 10, 20, and they did not introduce evidence at trial that would support holding Patriot independently liable on these causes of action. Furthermore, nothing in the Complaint provides a basis for such liability. As to the TILA claim, the Complaint does not allege facts suggesting that Patriot satisfies TILA's definition of a creditor, including the requirement that it have extended credit more than 25 times in 2015.[10] As for the breach of express warranty claim, the Complaint merely alleges that Winer verbally "assured Coralys Negron that the Vehicle's engine was in good condition." Compl. at 3 ¶ 17. However, as discussed above, this type of general, verbal representation does not create an express warranty. See, supra, 19-20. Therefore, the court concludes that default judgment is not warranted as to the claims against Patriot for breach of express warranty and violation of TILA.

The court further finds that the three factors that district courts must typically consider when deciding a motion for default judgment weigh in favor of entering default judgment against Patriot on the plaintiffs' claims for breach of implied warranty of merchantability, violation of RISFA, and violation of CUTPA. As to the first factor, the court finds that Patriot's default was willful in light of its failure to appear at any time during this action, despite receiving proper service of notice. See S.E.C. v. McNulty, 137 F.3d 732, 738–39 (2d Cir. 1998) ("[D]efaults have been found willful where, for

---

[10] The Complaint does allege that "Patriot Auto is a 'Creditor' within the meaning of the Truth in Lending Act." Compl. at 5 ¶ 33. However, this allegation is a legal conclusion, not a factual allegation, and it is well established that a default is not an admission of a complaint's legal conclusions. See Priestley v. Headminder, Inc., 647 F.3d 497, 506 (2d Cir. 2011) (holding that a default judgment cannot be based on a complaint's "bare legal conclusion[s]"); Advanced Capital Commercial Grp., Inc. v. Suarez, No. 09 CV 5558 DRH GRB, 2013 WL 5329254, at *3 (E.D.N.Y. Sept. 20, 2013) ("[B]ecause a defaulting defendant does not admit any legal conclusions, the plaintiff must establish that on the law it is entitled to the relief it seeks, given the facts as established by the default.") (internal quotation marks omitted).

example, an attorney failed, for unexplained reasons, to respond to a motion for summary judgment; or failed, for flimsy reasons, to comply with scheduling orders; or failed, for untenable reasons, after defendants had purposely evaded service for months, to answer the complaint; or failed, for incredible reasons, to appear for a scheduled pretrial conference and unaccountably delayed more than 10 months before moving to vacate the ensuing default.") (internal citations or quotation marks omitted); see also Andrus v. Juniper Grp., Inc., No. 08-CV-1900 JS AKT, 2011 WL 4532694, at *7 (E.D.N.Y. Sept. 26, 2011) ("[T]he failure of [the defendant] to appear in the action and respond to the Complaint, despite being properly served, sufficiently demonstrates willfulness."). As to the second factor, the court finds that denying the plaintiffs' application for default judgment against Patriot would prejudice the plaintiffs because "there are no additional steps available to secure relief in this Court." Andrus, 2011 WL 4532694, at *7; see also Mason Tenders Dist. Council v. Duce Const. Corp., No. 02CIV.9044(LTS)(GWG), 2003 WL 1960584, at *3 (S.D.N.Y. Apr. 25, 2003) (concluding that denial of a motion for default judgment "would be unfairly prejudicial to Plaintiffs" where, "[i]n light of Defendants' failure to respond, there is no indication that requiring Plaintiffs to take further steps prior to a determination on the merits would be effective in eliciting a response from Defendants"). Finally, as to the third factor, the court notes that no meritorious defense has been presented, and that nothing in the record suggests that such a defense exists.[11] McNulty, 137 F.3d at 740 ("In order to make a

---

[11] The court recognizes that defenses raised by a non-defaulting defendant may inure to the benefit of a defaulting defendant. See RSM Prod. Corp. v. Fridman, 387 F. App'x 72, 75 (2d Cir. 2010) ("Because the action was properly dismissed as to the appearing defendants, we cannot conclude that the district court abused its discretion in declining to enter default judgments against the non-appearing defendants.") (citing Davis v. Nat'l Mortgagee Corp., 349 F.2d 175, 178 (2d Cir. 1965)). However, as

sufficient showing of a meritorious defense in connection with a motion to vacate a default judgment, the defendant need not establish his defense conclusively, but he must present evidence of facts that, if proven at trial, would constitute a complete defense.") (internal citations and quotation marks omitted).  For these reasons, the court will enter default judgment against Patriot on the plaintiffs' RISFA claim, CUTPA claim, and claim for breach of the implied warranty of merchantability.

D.    Damages

Having found that Winer and Patriot are liable for breach of the implied warranty of merchantability, violation of RISFA, and violation of CUTPA, the court will now determine damages based on the evidence taken at trial.[12]

As to the plaintiffs' claim for breach of the implied warranty of merchantability, the plaintiffs seek the return of their $2,000 down payment because they claim that they validly and effectively revoked their acceptance of the Vehicle.  Compl. at 8 ¶ 51.  Under Connecticut's commercial code, "[w]hen a buyer justifiably revokes acceptance, he may cancel and recover so much of the purchase price as has been paid."  Conte v. Dwan Lincoln-Mercury, Inc., 172 Conn. 112, 120 (1976) (citing section 42a-2-711 of the Connecticut General Statutes).  "Section 42a-2-608 of the General Statutes sets up the following conditions for the buyer who seeks to justify revocation of acceptance: (1) a

---

discussed above, the court has already considered Winer's jurisdictional defense and found that it was without merit.  See, supra, at 10-15.

[12] Although Patriot's "default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages."  Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir.1992) (citations omitted).  The Second Circuit has cautioned that "[t]he default judgment d[oes] not give plaintiff a blank check to recover from defendant any losses it had ever suffered from whatever source."  Id. at 159 (internal quotation marks and alterations omitted).  Rather, "[t]he outer bounds of recovery allowable are . . . measured by the principle of proximate cause."  Id. at 158-59.

nonconformity which substantially impairs the value to the buyer; (2) acceptance (a) with discovery of the defect, if the acceptance is on the reasonable assumption that the nonconformity will be cured, or (b) without discovery of the defect, when the acceptance is reasonably induced by the difficulty of the discovery or the seller's assurances; (3) revocation within a reasonable time after a nonconformity was discovered or should have been discovered; and (4) revocation before a substantive change occurs in the condition of the goods not caused by their own defects." Id.  Revocation "is not effective until the buyer notifies the seller of it."  Conn. Gen. Stat. § 42a–2–608(2).

In this case, the court finds that the plaintiffs properly revoked acceptance of the Vehicle and that they are therefore entitled to their return of their $2,000 down payment. The court finds that the value of the Vehicle to the plaintiffs was substantially impaired by the Vehicle's internal mechanical problems.  See Conte, 172 Conn. at 117, 121-22 (holding that a jury could have reasonably found substantial impairment of value where the vehicle leaked oil, the cigarette lighter and windshield wiper did not work, and the vehicle eventually became undriveable).  Indeed, according to the uncontested repair estimates produced by the Subaru Dealership, fixing these problems would cost the plaintiffs $6,700, or about 75 percent of the cash price that the plaintiffs paid the defendants for the Vehicle.  See Pls.' Ex. 8.  The court further finds that the plaintiffs' acceptance of the Vehicle was reasonably induced by both the difficulty of discovering these internal mechanical problems and by Winer's assurances that the Vehicle worked fine and was in good condition.  Although the plaintiffs did not notify the defendants of their revocation of acceptance until March 2017, approximately four months after discovering the Vehicle's defects, the court finds that the revocation occurred within a

reasonable time period.  The Connecticut Supreme Court has previously found that a 14-month delay in revocation did not render the revocation untimely where, as here, "[the plaintiff] was in almost constant touch with the dealer concerning the condition of the vehicle, relying on the dealer's continued assurances that the automobile would be repaired satisfactorily."  Conte, 172 Conn. at 122.  Finally, Winer does not identify any substantive changes in the condition of the Vehicle that were not caused by the Vehicle's own defects, and none are apparent from the record.  Accordingly, the court finds that the plaintiffs validly and effectively revoked their acceptance of the Vehicle, and that Winer and Patriot are required to return the $2,000 down payment to the plaintiffs.

The plaintiffs' RIFSA claim seeks, in the alternative, the return of the $2,000 down payment through the rescission of the retail installment contract.  Compl. at 9 ¶ 39.  Rescission is "an implied remedy under RISFA" that aims to "restor[e] the parties to their respective positions prior to the contract" by requiring "the seller to refund the amounts paid by the buyer for the goods and the buyer to return the goods to the seller."  Barco Auto Leasing Corp. v. House, 202 Conn. 106, 113 (1987).  "As a condition precedent to a rescission, the plaintiffs [are] required to allege and prove that they had restored or offered to restore [the defendant] to its former condition as nearly as possible."  Keyes v. Brown, 155 Conn. 469, 476 (1967).  The plaintiffs' satisfied this condition precedent by sending the defendants a letter in March 2017 offering to return the Vehicle.  Accordingly, the defendants' violation of RISFA entitles the plaintiffs to rescission of the retail installment contract and to the return of their $2,000 down payment.

The plaintiffs' CUTPA claim seeks actual damages pursuant to section 42-110g(a) of the Connecticut General Statutes.  Compl. at 10 ¶ 42.  The court awards the plaintiffs $2,132.89 for the CUTPA claim against Winer and the same amount for the CUTPA claim against Patriot.  This amount reflects both the $2,000 down payment and the $132.89 that Coralys paid for the inspection of her Vehicle at the Subaru Dealership.[13]

The plaintiffs also seek an award of punitive damages under CUTPA.  See Conn. Gen. Stat. Ann. § 42-110g(a) ("The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.").  To award such punitive damages, the "evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights."  Tessmann v. Tiger Lee Construction Co., 228 Conn. 42, 54 (1993); see also Fabri v. United Techs. Int'l, Inc., 387 F.3d 109, 124 (2d Cir. 2004) (same).  The court awards $5,000 in punitive damages jointly and severally against Winer and Patriot for their violation of CUTPA.

Thus, the court awards a total of $7,132.89 to the plaintiffs for which Winer and Patriot are jointly and severally liable.  In rendering this award, the court is mindful of UCF's $2,000 settlement payment to the plaintiffs.  It recognizes that Connecticut courts adhere to the "rule precluding double recovery," which rule codifies the "simple and

---

[13] In their Memorandum in Support of Motion for Judgment (Doc. No. 14-1), the plaintiffs contend that their actual damages under CUTPA include not only the $2,000 down payment, but also the $495 price difference between the Vehicle's advertised price ($8,500) and its sales price ($8,995).  While the plaintiffs' actual damages encompass payments that the plaintiffs have already made on the Vehicle, they do not include payments that the plaintiffs would have made in the future had they completed the payment schedule under the retail installment contract.  Thus, the $495 price difference would only be recoverable as actual damages if the plaintiffs had paid the Vehicle's sale price in full ($8,995).  Because the record only shows that the plaintiffs made a $2,000 down payment on the Vehicle, the plaintiffs cannot claim the $495 price difference as actual damages.

time-honored maxim that a plaintiff may be compensated only once for his just damages for the same injury." Mahon v. B.V. Unitron Mfg., Inc., 284 Conn. 645, 663 (2007) (internal quotation marks and alterations omitted).  These same courts, however, have also held that payments to a plaintiff by settling co-defendants are not deducted from the judgment unless the combination of the judgment and the settlement payments are "excessive as a matter of law," "a threshold that is met only when the total amount received so far exceeds what is fair and reasonable as to be unconscionable." Id. at 665; see also Imbrogno v. Chamberlin, 89 F.3d 87, 90 (2d Cir. 1996) ("Under Connecticut law, a court may grant remittitur only when the jury verdict is excessive as a matter of law.") (internal quotation marks omitted).

In this case, several factors counsel against finding that the plaintiffs' total award is excessive as a matter of law.  To begin, Connecticut courts have indicated that deducting settlement payments from a judgment amount is more appropriate when a plaintiff's loss is "readily ascertainable and absolute," and the judgment amount "constitute[s] a legally unassailable determination of fair compensation." Mahon, 284 Conn. at 668-69, 670; see also Densberger v. United Techs. Corp., 125 F. Supp. 2d 585, 600-02 (D. Conn. 2000) (arriving at the same conclusion based on a review of the case law), aff'd, 283 F.3d 110 (2d Cir. 2002), opinion amended and superseded, 297 F.3d 66 (2d Cir. 2002), and aff'd, 297 F.3d 66 (2d Cir. 2002).  Here, in contrast, the plaintiffs' loss is more indeterminate.  Although the evidentiary record in this case only supports a compensatory award for the $2,000 down payment and the $132.89 inspection bill from the Subaru Dealership, the plaintiffs' Complaint identifies other consequential damages arising out of the Vehicle transaction that are less readily

ascertainable and absolute, including hardships flowing from the plaintiffs' loss of the use of the Vehicle and the difficulties that they experienced obtaining a substitute car due to the retention of the down payment and the debt that was claimed by UCF. Compl. at 10 ¶ 41.

Nor have the defendants come forward with evidence showing that the $2,000 settlement payment compensated the plaintiffs for the loss of the down payment or the Subaru inspection bill, even though "[the] party seeking a credit bears the burden of showing that double recovery has occurred and that a credit is proper." Levinson v. Westport Nat. Bank, No. 3:09CV269 VLB, 2012 WL 4490534, at *4 (D. Conn. Sept. 28, 2012) (collecting cases). While the defendants assert that the $2,000 settlement payment represents the return of the plaintiffs' down payment, nothing in the UCF Settlement Agreement suggests that UCF made this payment to compensate the plaintiffs for their loss of the down payment. The Agreement merely provides that UCF would pay the plaintiffs $2,000 in exchange for, inter alia, the plaintiffs' promise to "forego pursuit of claims against [UCF] relating to or arising directly or indirectly out of the Contract, Vehicle, Debt, or the Action." Pls.' Ex. 11. Considering that Coralys gave the $2,000 down payment to Winer and Patriot, rather than to UCF, the court concludes that the connection between the $2,000 settlement payment and the $2,000 down payment is tenuous at best and certainly falls far short of showing that the plaintiffs' judgment amount is excessive as a matter of law.

In summary, the court finds that the plaintiffs should be awarded $7,132.89, for which Winer and Patriot Auto Sales are jointly and severally liable. Any application for

attorneys' fees, costs, or post judgment interest must be filed within 30 days of the entry

of this judgment.  D. Conn. L. Civ. R. 11.

**V.      CONCLUSION**

For the foregoing reasons, the court finds that Winer and Patriot are jointly and

severally liable to the plaintiffs for breach of the implied warranty of merchantability,

violation of RISFA, and violation of CUTPA.

**SO ORDERED.**

Dated at New Haven, Connecticut this 7th day of May, 2019.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge