```
 1                      UNITED STATES DISTRICT COURT

 2                      DISTRICT OF CONNECTICUT

 3   _____
     Coralys Negron, et al      )
 4           Plaintiffs         )    NO: 3:17cv583(JCH)
                                )    April 11, 2019
 5    vs.                       )    9:57 a.m.
     Patriot Auto Sales, LLC,   )
 6   et al                      )
              Defendants.       )
 7   _____)    141 Church Street
                                     New Haven, Connecticut

 8

 9                    HEARING

10

11   B E F O R E:

12                    THE HONORABLE JANET C. HALL, U.S.D.J.

13

14   A P P E A R A N C E S:

15   For the Plaintiffs : Daniel S. Blinn
                           Consumer Law Group
16                         35 Cold Spring Rd., Suite 512
                           Rocky Hill, CT 06067
17

18

19   For the Defendants : Lauren Winer Beck
                           Laviano Law Offices
20                         632 Danbury Rd.
                           Ridgefield, CT 06877
21

22

23

24

25
```

1          THE COURT:  Good morning.  We're here this

2    morning in the matter known as Negron, et al versus

3    Patriot Auto Sales, et al, Case Number 3:17cv583.

4          MR. BLINN:  Your Honor, Daniel Blinn for the

5    plaintiffs.

6          THE COURT:  Good morning.

7          MS. WINER BECK:  Your Honor.

8          THE COURT:  I assume with you are the

9    plaintiffs?

10          MR. BLINN:  Yes.

11          THE COURT:  Thank you.

12          MS. WINER BECK:  Lauren Winer Beck for the

13    defendant.

14          THE COURT:  Good morning.

15          And with you?

16          MS. WINER BECK:  Is Jason Winer, my defendant.

17          THE COURT:  Okay.

18          MS. WINER-BECK:  And Jeffrey Beck, my legal

19    assistant.

20          THE COURT:  Thank you.  We're ready to begin

21    with evidence.

22          MR. BLINN:  My first witness is a Coralys

23    Negron.

24          THE COURT:  Come up to the witness stand.  When

25    you arrive, I ask that you please remain standing.  The

1    clerk is going to administer an oath to you.

2            CORALYS NEGRON.

3    Having been called as a witness, was first duly sworn and

4            testified on his/her oath as follows:

5            THE WITNESS:  Yes.

6            THE COURT:  Please state your name and city and

7    state of residence.

8            THE WITNESS: Coralys Negron.

9            Derby, Connecticut.

10           THE COURT:  Good morning.  You may be seated.  I

11   ask if you would make sure the microphone is, you know,

12   about this far away from you.  Whenever you're ready.

13   DIRECT EXAMINATION BY MR. BLINN:

14      Q.   Yes, Your Honor.  Should I give her a stack of

15   the exhibits to begin or should --

16           THE COURT:  Sure.  If she's going to be

17   referring to them that would be helpful.

18           MR. BLINN:  Thank you.  Try to keep these in

19   order.  (Handing.)

20   BY MR. BLINN:

21      Q.   Ms. Negron, could you begin by introducing

22   yourself briefly to the Court?

23      A.   Yes.  I am Coralys Negron.  I'm 30 years old.

24   Originally from Puerto Rico.  I've lived most of my life

25   in Derby.  I work at CVS Pharmacy there as a lead tech.

1    I went to school for hairdressing and decided that I like

2    business better, so I'm working on my real estate license

3    now.

4         Q.   I would like you to explain the circumstances as

5    to why you were interested in purchasing a motor vehicle

6    in October of 2016?

7         A.   I had a rear-wheel drive.  That's not good in

8    the snow or safe, so I decided that I needed an all-wheel

9    drive car.

10        Q.   What did you do to look for a vehicle?

11        A.   I started doing some research, looking around,

12   Craig's List, online and stuff like that.

13        Q.   And how did you find the 2008 Subaru WRX?

14        A.   That one I found on Facebook.  It was an ad from

15   a friend.

16        Q.   Can you turn to Exhibit 1?

17        A.   Yes.

18        Q.   Is this the ad that you are referring to?

19        A.   Yes, that was the ad.

20        Q.   And who is Brendan Smith.

21        A.   Brendan Smith is a friend.  He was a co-worker

22   at the time.

23        Q.   This is his Facebook page that we're looking at?

24        A.   Yes.

25        Q.   Why were you interested in this vehicle?

1      A.   Well, I thought it was a good price.  Also I

2  heard that Subarus are really good in the snow.

3      Q.   Now, the ad indicates just before the model year

4  of the car, sold.  When you saw the Facebook ad?

5           MS. WINER BECK:  Objection.  Compound.

6           THE COURT:  You should let him finish but.  It

7  actually is a statement before the question so it is

8  probably improper.  If you can rephrase.

9      Q.   All right.  Did the ad say "sold" on it at the

10  time that you originally saw the ad?

11      A.   No.

12      Q.   Did you print out this ad sometime after this

13  dispute arose?

14      A.   Yes.

15      Q.   And is Exhibit 1 a copy of what you printed out

16  afterwards?

17      A.   Yes.

18      Q.   Now, what did you do when you saw this?  How did

19  you explore the issue?

20      A.   Well, I reached out to Brendan first and asked

21  about the car and who had the car, and he gave me the

22  information to get in touch with Patriot Auto Sales.

23      Q.   Did you contact Patriot?

24      A.   Yes.

25      Q.   How did you do that?

1       A.    I called and I got in touch with Jason and

2    that's then after that, we started texting.

3       Q.    When you say "Jason," do you mean the defendant,

4    Jason Winer?

5       A.    Yes.

6       Q.    Tell us about those conversations please.

7       A.    Pretty much asking about the car, when I could

8    see it and then we pretty much like decided to meet up

9    then I can look at the car.

10      Q.    Did he say anything to you about his

11   relationship with Patriot Auto Sales?

12      A.    Yes.   When I got there.   I didn't realize it was

13   like a actual dealer.   I thought it was his car.   Pretty

14   much he told me he was the owner.

15      Q.    He said he was the owner of what?

16      A.    Patriot Auto Sales.

17      Q.    Did you believe that you were dealing with the

18   owner of Patriot Auto Sales?

19      A.    Yes.

20      Q.    Why did you believe that?

21      A.    I had no reason not to.

22      Q.    Did you go and look at the car?

23      A.    Yes.

24      Q.    When was that?

25      A.    That was a day after work, I went to go look at

1  it.  I met up with him, yeah, in the auto sales in

2  Bridgeport.

3      Q.   Was this in late October?

4      A.   Yes.  Oh, yeah.

5      Q.   And tell us about your first impressions of the

6  car?

7      A.   Well, the car wasn't -- it was a little beat up

8  around like aesthetic wise.  It didn't matter to me

9  because I already had another car.  I wanted it to work

10  properly to get me back and forth to work in the snow.

11     Q.   Were there any signs on the car?

12     A.   Any signs of what?

13     Q.   Any signs or tags or anything like that?

14          MS. WINER BECK:  Withdrawn.

15          THE COURT:  You may answer.

16     A.   I'm sorry.  Can you --

17          THE COURT:  He asked were there any signs or

18  tags on the car?

19     A.   Signs or tags what you do you mean?

20     Q.   Was the price posted on the car?

21     A.   Yes.  I'm sorry, yes.

22     Q.   What was the price posted on the car?

23     A.   8500.

24     Q.   $8,500?

25     A.   Yes.

1    Q.   And in your discussions with Mr. Winer, did he

2    tell you that the price would be anything other than

3    8500?

4    A.   No.

5    Q.   What did you think the price of the car was?

6    A.   8500.

7    Q.   Why?

8    A.   Because that's what was written on there.

9    Q.   Did the price -- describe how the price was

10   displayed on the car?

11   A.   It was written I'm guessing by marker.  You

12   know, eight comma five zero zero.

13   Q.   Was it on the windshield?

14   A.   Yes, it was on the windshield.

15   Q.   Was there any indication that there were any

16   dealer conveyance fees on the windshield?

17   A.   No.

18   Q.   Did Mr. Winer ever say anything to you about any

19   charges for a dealer conveyance fee?

20   A.   No.

21   Q.   And did you have discussions with Mr. Winer

22   regarding the condition of the car?

23   A.   Yes.  I just wanted to drive it and make sure

24   the motor was fine and running.  I didn't care about the

25   marks on the car on the outside.  I wanted it to work

1    properly.

2        Q.    Is that something you said to him?

3        A.    Yes.  I said that to him, yes.

4        Q.    What did he say in response?

5        A.    He said that the car was working fine.  It was

6    great.  A one owner before that so it had no issues.

7        Q.    Did you have any discussions with Mr. Winer

8    regarding whether you were going to be paying cash for

9    the vehicle or whether you needed to finance a portion?

10            MS. WINER BECK:  Objection.  Compound.

11            THE COURT:  I will allow it.  If you can answer

12   it.  If ever he asks a question -- you have already done

13   this the correct way -- you are not sure what he's asking

14   or confused by it, you just say I don't understand.  I

15   can't answer.  Something like that and he'll rephrase it.

16   That objection is overruled.  I will let her answer.

17   BY MR. BLINN:

18       Q.    Were there any discussions about whether you

19   were going to pay cash for the car and finance it?

20       A.    Not immediately.  I had already thought about

21   financing, but he did ask me if I could pay cash for it.

22       Q.    What did you tell him?

23       A.    I said no.

24       Q.    Now, did you have enough money available to buy

25   that car for $8,500 plus taxes and registration?

1      A.    Yes.

2      Q.    Why did you want to finance it if you had enough

3  money?

4      A.    Because it was all I had.  I wanted to finance

5  it for credit purposes.

6      Q.    Could you elaborate why you wanted to finance

7  for credit purposes?

8      A.    Yeah, I was looking forward to buying a house

9  and I needed to increase my credit score.

10     Q.    And did you discuss any of that with Mr. Winer?

11     A.    Yes.

12     Q.    And what exactly did you say to him?

13     A.    I pretty much told him that I had the money for

14 the car and it was easier to finance and make that

15 statement on my credit base, and I was looking forward to

16 moving on and getting a house and all of that stuff.

17     Q.    Did you tell him how much you were able to put

18 down as a down payment?

19     A.    Yes.

20     Q.    What did you tell him?

21     A.    I told him I can put about $3,000 down.

22     Q.    Did Mr. Winer tell you that the price would be

23 higher if you financed the vehicle?

24     A.    No.

25     Q.    Did you have any discussions with him

1    regarding -- regarding the banks that he worked with and

2    how he financed vehicles?

3        A.   Yeah.  He said he worked with a lot of banks.

4    It should be easy getting me approved with the down

5    payment.

6        Q.   Did you fill out a credit application?

7        A.   Yes.

8        Q.   And did you sign a purchase order?

9        A.   Sign what?

10       Q.   Did you sign a purchase order?

11       A.   I believe so.

12       Q.   You signed some papers to buy the car?

13       A.   Yes.

14       Q.   Is Exhibit 2 in front of you, is that a copy of

15   the purchase order that you signed?

16       A.   Yes.

17       Q.   Now, could you take a look, please, on the right

18   side of the purchase order and in particular, take a look

19   at about two-thirds of the way down.  It says in part 2,

20   it indicates that that's a down payment.  What is the

21   amount of that down payment reflected in the purchase

22   order?

23       A.   $2,000.

24       Q.   Did you pay -- did you give Mr. Winer $2,000

25   that day?

1    A.    Yes.

2    Q.    And was that -- how did you pay it?

3    A.    I paid in cash.

4    Q.    Did you have the cash with you when you went to

5  Patriot Auto?

6    A.    No, I did not.

7    Q.    How did you get the cash?

8    A.    I went to a close bank there and I got the cash

9  out.

10   Q.    And you gave the cash to Mr. Winer?

11   A.    Yes.

12   Q.    Is this your signature on the bottom of this

13  purchase order?

14   A.    Is this my what?

15   Q.    Is that your signature on the bottom of the

16  purchase order?

17   A.    Yes.

18   Q.    Now, did you notice the price listed was $8,995

19  at the time that you signed this?

20   A.    No.

21   Q.    Were you given a copy of the purchase order at

22  the time that you signed this?

23   A.    Yes.  Yes, I believe so.

24   Q.    And is there any discussion at that time about

25  anybody being a cosigner for the vehicle?

1   A. No.

2   Q. Were you told at that point that your credit was

3 approved?

4   A. Pretty much.  He made it seem like it was going

5 to be an easy go ahead with the car.

6   Q. Did he tell you that you were approved?

7   A. No.

8   Q. Now, did you take delivery of the car that day?

9   A. No.

10   Q. And why not?

11   A. Well, first he wanted to check with the banks.

12 I believe he said he needed to do a few safety checks on

13 the car.

14   Q. So do you know whether he said he had to do

15 safety checks on the car?

16   A. Yeah.  He wanted to get it cleaned and get it

17 ready for me to take it.

18   Q. Now, did there come a time when he called you on

19 a later day to talk about your finance application?

20   A. Yeah.

21   Q. Tell us about that, please?

22   A. He told me that I was not approved for the car,

23 and I needed to pay cash for it or get a cosigner.

24   Q. So what did you do?

25   A. I got a cosigner.

1     Q.    And who did you get?

2     A.    My brother.  My brother to cosign.

3     Q.    That would be Francisco?

4     A.    Yes.

5     Q.    Sitting right behind me?

6     A.    Yes.

7     Q.    And did Francisco agree to cosign?

8     A.    Yes.

9     Q.    And were you informed about the credit decision

10    after Francisco agreed to cosign?

11    A.    Yes.

12    Q.    What were you told?

13    A.    I was told that I was approved for the car

14    afterwards.

15    Q.    Now, how long after that before you came to sign

16    papers to finalize the sale?

17    A.    Probably a few days.

18    Q.    Tell us how that came about?

19    A.    Well, at the time, I was working overnight

20    shifts.  Most of the daytime I was sleeping.  He offered

21    to come because he lived nearby I guess.  He offered to

22    come bring the paperwork to me, so I can sign it and then

23    get the car.

24    Q.    Okay.  And did he come?

25    A.    Yes.

1    Q.   And did he bring the vehicle with him or did he

2    take a different vehicle?

3    A.   No.  He was in a different vehicle.

4    Q.   Did he have papers for you to sign?

5    A.   Yes.

6    Q.   And did he come into the house?

7    A.   No.

8    Q.   What happened?

9    A.   He called me, told me he was there.  I came

10   outside.  I went into his vehicle and he put the arm rest

11   down and I signed the paper finalizing the purchase of

12   the car.

13   Q.   Could you describe what the process was like

14   when you executed the papers?

15   A.   I pretty much went in there.  He showed me the

16   paper I was signing and did a quick here is your name.

17   This is what you are paying.  This is the monthly so on

18   and so on, sign at the line and date.

19   Q.   And did you look closely at the papers that you

20   were signing?

21   A.   No.

22   Q.   Why not?

23   A.   I mean I trusted him, you know.  I work with his

24   technically stepson I guess.  I didn't see why not.  We

25   went through the paperwork and the pricing.  I figured

1    that's what was on the paper.

2         Q.    What was your understanding of Mr. Winer's

3    relationship with Brendan Smith?

4         A.    They were family as far as I knew.

5         Q.    What was your relationship with Brendan?

6         A.    He was a co-worker and a friend.

7         Q.    Where did you work together?

8         A.    At CVS Pharmacy.

9         Q.    And did you trust Mr. Winer?

10        A.    Yes.

11        Q.    How many times have you bought cars before this?

12        A.    Just one.

13        Q.    And were you given a copy of the papers that you

14   signed in the car in front of your house?

15        A.    No.

16        Q.    What happened after you signed?

17        A.    After I signed, I thought it was pretty much

18   done and then I asked him about when I was going to get

19   the car.  He told me a few days afterwards.  He was

20   finishing doing oil changes and cleaning it up.

21        Q.    Was Francisco home when you signed the papers?

22        A.    Yes.

23        Q.    Did he sign the papers, too?

24        A.    Yes.

25        Q.    Were you guys in the car at the same time?

1      A.   No.

2      Q.   Tell us how Francisco came to join the process?

3      A.   After that, he asked me if he was there.  I was

4  like yes.  I would go get him.  I went inside.  Francisco

5  came out and did the same thing.  Went into the vehicle

6  and signed.

7      Q.   Did you go in the car with him?

8      A.   No.

9      Q.   Where were you?

10      A.   I went back into the house.

11      Q.   How long was Fransico in the car for?

12      A.   A few minutes.

13      Q.   Did Francisco get copies of the papers?

14      A.   No.

15           MS. WINER BECK:  Objection.  Leading.

16           THE COURT:  Overruled.

17  BY MR. BLINN:

18      Q.   Now, you were telling us before about the

19  discussions about when you would be able to get the car.

20  What did Mr. Winer say?

21      A.   He just told me that he needed to take it to get

22  an oil change and clean it up.  As soon as it was

23  finished, I would be able to pick it up.

24      Q.   Any idea how long it was going to be before you

25  got it?

1     A.   No.  He told me a few days at the most.

2     Q.   Now, I would like you to explain why you were

3 signing contract documents without looking at the numbers

4 and your willingness to proceed on that basis?

5     A.   I honestly didn't think anything of it.  We had

6 already talked about the price.  I saw the price on the

7 car.  It was in the ad.  I put enough money down.  I

8 calculated that I was able to afford the car, so I think

9 at that point, I just wanted to make my credit work and I

10 had enough money to afford whatever the monthly payment

11 was.

12    Q.   Now, did you ever get any documents from Patriot

13 Auto Sales from Mr. Winer concerning the purchase other

14 than Exhibit 2 from Patriot Auto Sales or Mr. Winer?

15    A.   The purchase order, yeah.  That was the only

16 paper I believe I got from him.

17    Q.   Now, did you eventually get the car?

18    A.   Yes.

19    Q.   How long after you signed the papers before you

20 got it?

21    A.   Probably about a week.

22    Q.   And tell us about that process?

23    A.   I called him because I was wondering what was

24 taking so long with the car, and he told me he was going

25 to get back to me when I can pick up.  Eventually he did.

```
1    Again I worked overnight, so I couldn't pick it up

2    myself, so I had my brother pick it up.

3         Q.    Francisco?

4         A.    Yes.

5         Q.    Who was the finance company that was providing

6    financing for this vehicle?

7         A.    I believe it was United.

8         Q.    United Consumer Finance?

9         A.    Yes.

10        Q.    And did you get a statement from there?

11        A.    Eventually, yes.

12        Q.    And was there anything about that statement that

13   caused you to become concerned?

14        A.    Yeah.  The payments were higher than I thought

15   they were going to be.

16        Q.    And what did you do?

17        A.    I called them to figure out, you know, how that

18   went up so much.

19        Q.    And what did you find out?

20        A.    A few things.  The down payment I had put down

21   was not in the full quantity.  It was just a thousand.

22   The car had went up from --

23             MS. WINER BECK:  Objection.  Hearsay.

24             THE COURT:  Overruled.

25        A.    I guess it went from 8500 pretty much with
```

1    interest and everything 12,000.

2        Q.   Did you try to call Jason?

3        A.   Yes.

4        Q.   And were you able to reach him?

5        A.   Not immediately.

6        Q.   Did you leave a message?

7        A.   Yes.

8        Q.   Did he call you back?

9        A.   Eventually, yes.

10        Q.   And did you ask United to send you a copy of the

11    finance agreement?

12        A.   Yes.

13        Q.   And did United do that?

14        A.   Yes.

15        Q.   Is Exhibit 3 a copy of the agreement that United

16    sent to you?

17        A.   Yes.

18            THE COURT:  May I inquire the basis for your

19    statement that the down payment was the reason that -- a

20    reason the payment was higher was the down payment wasn't

21    fully set forth as you expected.  What was the basis for

22    your answer?  How did you come to have knowledge of that?

23        A.   This was over the contract.

24            THE COURT:  I'm sorry.  What contract?

25        A.   Retail installment contract.

1          THE COURT:  So 3 is a basis for your prior

2     testimony?

3          A.   Yes.

4          THE COURT:  Thank you.

5     BY MR. BLINN:

6          Q.   Now, did you learn in reviewing these documents,

7     that the price of the car was something other than what

8     you had expected it to be?

9          A.   Yes.

10         Q.   What did you see?

11         A.   I saw the price had gone up, the interest was

12    really high and the down payment was not what I put down.

13         Q.   Let's talk about the price first.  What did you

14    learn that was price was?

15         A.   8500 originally and it went up almost to

16    $10,000.

17         Q.   Could you take a look at Exhibit 2?

18         A.   Yup.

19         Q.   And did you see the cash price listed on the

20    purchase order?

21         A.   Not originally but yes.

22         Q.   But when you were looking at the paperwork more

23    closely did you see that?

24         A.   Yes.

25         Q.   What was the cash price?

 1      A.   8995.

 2      Q.   And could you turn to Exhibit 3 and I would like

 3 you to turn to the second page of that exhibit, the

 4 itemization of the amount financed.  Did you review these

 5 numbers?

 6      A.   Yes, I saw these numbers.

 7      Q.   You saw that -- you already testified about the

 8 cash price and the down payment.  Take a look at item P.

 9 $399 for VSI.  Is that something that you knew about?

10      A.   No.

11      Q.   Did Mr. Winer tell you there was going to be a

12 $399 charge for VSI?

13      A.   No.

14      Q.   Q is a Doc Fee for $299.  Did Mr. Winer say

15 anything to you about that?

16      A.   No.

17      Q.   And title and registration, were you expecting

18 to pay for title and registration?

19      A.   Myself, yes.

20           THE COURT:  When you received the car, had the

21 title and registration been completed?

22      A.   Yes.

23           THE COURT:  You didn't incur additional title

24 and registration expenses?

25      A.   I don't remember.

1   BY MR. BLINN:

2       Q.   There's several signatures on the Retail

3   Installment Contract.  I would like you to take a look

4   first at the one on page 2.  That's the page that we were

5   just looking at with some of the items.  Is that

6   signature on page 2 your signature?

7       A.   Yes.

8           MS. WINER BECK:  Objection.  There's no claim to

9   that in this complaint.

10          THE COURT:  I'm sorry.  What does that mean?

11          MS. WINER BECK:  There's no claim that this

12  document has been forged in his complaint.

13          THE COURT:  He's asking a factual question about

14  the document in question.  He's not making an argument.

15  He's not making a claim.  He's proving up a case.  The

16  objection is overruled.

17  BY MR. BLINN:

18      Q.   Your answer was yes?

19      A.   Yes.

20      Q.   You can't nod your head.

21      A.   Yes.

22      Q.   In the signature on page 3, is that your

23  signature?  Take a look.  It says page 3 of 5 on the

24  bottom right-hand corner.

25      A.   No.

1          THE COURT:  I can't hear you.  I'm sorry.

2     A.   No.

3          THE COURT:  No.  It is not your signature on

4     page 3 of 5?

5     A.   No.

6          THE COURT:  No means that I was wrong, so let's

7     be clear.  Is it your signature on page 3 of 5?

8     A.   We're talking about not 2  We're talking about

9     3, correct?

10         THE COURT:  Page 3 of 5, the upper right, it

11    says page 04/06.

12    A.   Okay.  So these ones.  Yes.

13    BY MR. BLINN:

14    Q.   That one is your signature?

15    A.   Those.

16    Q.   Could you turn to the last page of the exhibit?

17    A.   Okay.

18    Q.   And there's a signature spot in two different

19    places.  I would like you to look at the one on the right

20    side that's higher up.  Is that your signature?

21    A.   No.

22    Q.   And the one at the very bottom on the left is

23    that your signature?

24    A.   No.

25    Q.   And I will ask you if you take a look at pages

1   1, 2, 3, and 4.  There's an initial?

2        A.   Yes.

3        Q.   Does that appear to be your handwriting?

4        A.   Yes.

5        Q.   On page 2?

6        A.   Yes.

7        Q.   And on page 3, that's the one that's page 04 of

8   06 in the upper right-hand corner.

9        A.   Yes.

10       Q.   And on page 4 of 5.

11            The last one the 06/06 on the top?

12       Q.   No.  The one that says page 4 of 5.

13            THE COURT:  At the top it says 05/06.

14       A.   Yes.

15   BY MR. BLINN:

16       Q.   And are there any initials on the last page that

17   had -- the one that has the signatures that you say were

18   not yours?

19       A.   Were there any what -- I'm sorry.

20       Q.   Are there any initials in the lower right-hand

21   corner of page 05 of 05?

22       A.   Yes.

23       Q.   May I approach, Your Honor?

24            THE COURT:  You may.

25   BY MR. BLINN:

1    Q.   Could you show me which page you are looking at.

2    A.   This one?

3    Q.   No.

4    A.   Sorry.

5    Q.   That's okay.  This one here.

6    A.   Oh.

7    Q.   Were there any initials in that corner?

8    A.   No.

9         MR. BLINN:  Your Honor, I just realized that the

10   document I handed her had a couple of notes by me on it.

11   Can I take a look at the rest of her stack to make sure

12   there aren't any others that have notes?

13        THE COURT:  Yes.

14        MR. BLINN:  Thank you.  May I reapproach?

15        THE COURT:  Yes.

16        MR. BLINN: I'm sorry.  I would like to give her

17   another copy of Exhibit 3 that's clean, if I may.

18        THE COURT:  Yes.

19        MR. BLINN:  (Handing.).

20   BY MR. BLINN:

21   Q.   Now, in the course of discovery in this case,

22   were there documents that were produced by United

23   Consumer Finance?

24   A.   Yes.

25   Q.   And I'm going to show you one of those

1   documents.  It's been marked as Exhibit 4.  And if you

2   take a look on the left-hand side, there's a box that

3   reads "as is."  And there's an X on there.  And there's a

4   signature under "customer signature."  Is that your

5   signature?

6       A.   No.

7       Q.   And could you compare that to Exhibit 2 and tell

8   me whether or not that "as is" box is checked on the

9   purchase order that you were given?

10      A.   No.

11      Q.   And is there a signature in the spot for

12  customer signature on Exhibit 2?

13      A.   No.

14      Q.   Did you sign the "as is" box on the purchase

15  order for this car?

16      A.   Yes.

17      Q.   That is your signature on Exhibit 4?

18      A.   On 4, no.

19      Q.   And when you said that you did sign it, what

20  signature were you referring to?

21      A.   I was looking at the purchase order.

22      Q.   You are talking about the signature down on the

23  bottom?

24      A.   Yes.

25      Q.   Not that box that says "as is"?

1      A.    No.  Not the box.

2      Q.    Could you look at the bottom of the second page

3  of Exhibit 4.

4      A.    Okay.

5      Q.    It's very -- do you recognize your signature on

6  that?

7      A.    No.

8      Q.    Did you sign that?

9      A.    No.

10      Q.    And was Exhibit 5 another document that was

11  produced by United Consumer Finance in this case?

12      A.    Yes.

13      Q.    And did you provide credit information as part

14  of the application to finance this purchase?

15      A.    Yes.

16      Q.    And is the information described regarding your

17  income and your work and so forth is that accurate?

18      A.    Yes.

19      Q.    Is that your signature on Exhibit 5?

20      A.    Yes.

21      Q.    It is?

22      A.    On Exhibit 5.

23      Q.    Exhibit 5?

24      A.    No.

25      Q.    The credit application?

1     A.    No, not the credit application.

2     Q.    Which document were you referring to when you

3 said it was your signature?

4     A.    Two.

5     Q.    We're going to talk about one exhibit at a time,

6 so we don't have that type of confusion.  Now, in

7 particular, I want to make sure we're all looking at the

8 same place.  About 80 percent of the way down there's a

9 spot for applicant.

10    A.    Yes.

11    Q.    Do you see that?  Is that your signature on that

12 Exhibit 5 right next to the word "applicant"?

13    A.    No.

14    Q.    And was Exhibit 6, can you turn to that please.

15 Was Exhibit 6 another document that was produced by

16 United Consumer Finance in this case?

17    A.    Yes.

18    Q.    And if you look at the bottom left-hand corner,

19 there's a place that says "customer signature".

20    A.    Yes.

21    Q.    Is that your signature?

22    A.    No.

23    Q.    Up above where it says "customer name", there's

24 a name in script.  Is that your signature?

25    A.    No.

1    Q.   Do you know who signed your name to the last

2    signature spot on Exhibit 3 or on Exhibit 4, 5, or 6?

3    A.   No.

4    Q.   Did you authorize anybody to sign your name on

5    those documents?

6    A.   No.

7    Q.   Did anybody ever tell you that they were going

8    to sign your name on any of those documents?

9    A.   No.

10   Q.   I would like you to turn next to Exhibit 7.  The

11   Connecticut K208 form, the CT License Dealer Inspection

12   Form.  Do you have that document?

13   A.   Yes.

14   Q.   And was this a document that was given to you by

15   Patriot Auto Sales or by Mr. Winer?

16   A.   No.

17   Q.   Did we receive this in discovery?

18   A.   Yes.

19   Q.   And do you see your signature anywhere on this

20   document?

21   A.   No.

22   Q.   Now, you testified previously that your brother

23   picked up the car?

24   A.   Yes.

25   Q.   And after you got the car, how were you finding

1  it was performing?

2      A.   It was not very good.  I started driving it and

3  it started moving like the car like the struts needed to

4  be changed.  Then I had after that, I had a mechanic

5  friend look at it with me, and we found out there was no

6  oil on the car.

7      Q.   How long after you got possession of the car,

8  did your friend take a look at it?

9      A.   Probably about a week.

10      Q.   And does this friend have any particular

11  experience with automobiles?

12      A.   Yes.

13      Q.   What's that?

14      A.   He's a mechanic.

15          MS. WINER BECK:  Objection.  Hearsay.

16          THE COURT:  I think that he's a mechanic is

17  hearsay, so the objection is overruled.

18  BY MR. BLINN:

19      Q.   You testified there's no oil.  Did you see the

20  oil yourself?

21      A.   Yes.

22      Q.   Describe how it was that you saw that there was

23  no oil in the car?

24      A.   He called my over and he wiped the string rod.

25          MS. WINER BECK:  Objection.  Hearsay.

1          THE COURT:  She's not recounting any statements

2     made out of court.  She's describing a physical movement

3     which is clearly testimony that can be given in court.

4     You can cross-examine her.

5          MS. WINER BECK:  We don't know who the "he" is.

6          THE COURT:  It doesn't matter.  If I stand in an

7     intersection and see a car go through a red light, I can

8     testify that blue car went through a red light.  I don't

9     know who is driving it.  I don't know anything about the

10    person in the car.  I'm testifying about what I saw.  The

11    objection is overruled.  You may continue with your

12    description of what you observed, not what he said, what

13    you observed.

14    A.     He explained to me he put it back in there and

15    when he brought the rod back out it was dry.

16    Q.     Do you know how to check for oil left in a car

17    by putting a dipstick, wiping it and putting it back in?

18    A.     Yes.

19    Q.     Is that something that you have done yourself?

20    A.     Yes.

21    Q.     Did he do anything different than when you check

22    an engine level dipstick?

23    A.     No.

24    Q.     At this point, did you have any concerns?

25    A.     Yes.

1      Q.    What were you concerned about?

2      A.    The car not working at all.

3      Q.    Well, you say not working at all.  Was it

4  running?

5      A.    Not running, yeah.

6      Q.    The car was not running?

7      A.    The car was running, but I was concerned of it

8  eventually just dying.

9      Q.    And what did you do?

10     A.    I called Jason.

11     Q.    And what did you tell him?

12     A.    I told him that, you know, I had somebody look

13  at the car and I explained what was going on.

14     Q.    Specifically what did you tell him?

15     A.    Yeah.  I told him that the car had no oil.

16     Q.    What did he say?

17     A.    He said that that was impossible because he just

18  had the car get an oil change.

19     Q.    He just changed the oil?

20     A.    Yeah.

21     Q.    What did -- did Jason tell you to do anything?

22     A.    He told me to fill it up again and give it

23  another week to see, like, it should be fine.

24     Q.    And did you fill it with oil?

25     A.    Yes.

1    Q.   And did you check the oil again after about a

2  week?

3    A.   Yes.

4    Q.   What did you see?

5    A.   The car was empty on oil again.

6    Q.   So did you have another conversation with Mr.

7  Winer?

8    A.   Yes.

9    Q.   Please tell us about that.

10    A.   Well, I was upset because I knew that if the car

11  had no oil, I couldn't drive it.  It would eventually

12  break completely.  I was concerned about getting it

13  fixed.  What would be my next step with him to try to get

14  this fixed?

15    Q.   What did he say in response?

16    A.   He pretty much told me that he can have somebody

17  look at it and try to fix it for me.

18    Q.   Did he ever suggest that you take it to the

19  Subaru dealership?

20    A.   Yes.

21    Q.   When did he do that?

22    A.   I think afterwards.  I kept asking.  He said why

23  don't you have a professional Subaru person look at it

24  before we move forward with that.

25    Q.   Where did you take it?

1    A.    I took it to Dan Perkins in Milford.

2    Q.    Is Exhibit 8 a copy of the invoice for Dan

3  Perkins' inspection?

4    A.    Yes.

5    Q.    And did you pay $132.89 for that inspection?

6    A.    Yes.

7    Q.    Is that reflected on the invoice?

8    A.    Yes.

9    Q.    And did you discuss with Mr. Winer the results

10 of what happened when you took it to Dan Perkins Subaru?

11   A.    Yes.

12   Q.    Please tell us what you said to Mr. Winer.

13   A.    I pretty much told him what happened with the

14 car and that it needed to either be fixed or I wanted to

15 give the car back.

16   Q.    What did you tell him happened with the car?

17   A.    Well, after that, I stopped driving it and it

18 kept not having any oil, so the motor was getting ready

19 to go.

20   Q.    And what did Mr. Winer say?

21   A.    He tried telling me that was normal for Subarus.

22   Q.    To run out of oil every week?

23   A.    Yeah.  He said that they would burn oil here and

24 there.  But I was concerned because it wasn't here and

25 there.  It was empty.

1      Q.    When you filled up the oil, how many quarts did

2   you have to put in?

3      A.    Five.  About five.

4      Q.    Five quarts.  And so did there come a time that

5   you asked him to take the car back?

6      A.    I'm sorry.  What was that?

7      Q.    Did you ask him to take the car back?

8      A.    Yes.

9      Q.    When was that?

10     A.    Eventually after that, I told him I just wanted

11  to give the car back and get my money back because the

12  car wasn't going to work out.

13     Q.    Can you be more specific?  You say after that.

14  After what?

15     A.    After I took it to Dan Perkins.

16     Q.    What did Mr. Winer say?

17     A.    He told me that he was going to call United and

18  see what the process would be to give the car back and

19  get the money back.

20     Q.    And did Mr. Winer call you back after that

21  conversation?

22     A.    No.

23     Q.    Did you eventually try to call him back to find

24  out where things stood?

25     A.    Yes.

1      Q.   Tell us about that?

2      A.   Well, I kept trying to call him I think about a

3  week afterwards.  I didn't hear from him so I called

4  again, didn't pick up.  I left messages.  Eventually I

5  called Brendan and see if I can somehow get in touch with

6  him through Brendan.

7      Q.   Brendan Smith?

8      A.   Yes.

9      Q.   And did leaving a message with Brendan Smith

10  result in Mr. Winer calling you back?

11      A.   No.

12      Q.   So did you speak with Mr. Winer again about

13  where things stood with United in taking the car back?

14      A.   Yes.

15      Q.   How did that come about?  What did he say to

16  you?

17      A.   Thank God another day I called and he eventually

18  picked up and I talked to him.  When I talked to him this

19  was as if the first time I was complaining about the car.

20      Q.   Did you tell him again about your problems with

21  the car and the oil consumption?

22      A.   Yes.

23      Q.   What did he say?

24      A.   And then he told me that he was going to look

25  into having somebody look at the car for me and fixing

1   it.

2       Q.   What happened after that?

3       A.   After that, I decided to call my lawyer.

4       Q.   Okay.  Now, did he ever tell you that he was

5   waiting on a response from United Consumer Finance?

6       A.   Yes.

7       Q.   When was that?

8       A.   I think that was before I called him and got the

9   paperwork.  I called I think between calling him.  Before

10  that conversation, I had called the bank and wanted to

11  see and talk about the monthly payments and how like if I

12  have to do anything to start the process to return the

13  car back to the dealer and they had told me that well, I

14  concluded that Jason was lying about calling the bank.

15      Q.   So when you called United, you were not able to

16  verify that he had been in touch with United about giving

17  the car back?

18      A.   Yes.

19      Q.   Is that when you consulted with a lawyer?

20      A.   Yes.

21      Q.   And did you consult with my office?

22      A.   Yes.

23      Q.   And did you authorize us to send Exhibit 9 to

24  Patriot and to United Consumer Finance?

25      A.   Yes.

1      Q.   Now, did United Consumer Finance pick up the car

2    after this letter was sent?

3      A.   Yes.

4      Q.   And why didn't you just return the car to

5    Patriot Auto?

6      A.   Because we never had an agreement.  Jason never

7    made it clear what was going on.  If I was going to be

8    able to get my money back, how it would affect my credit

9    with the bank and all of that stuff.  We never came into

10   an agreement.

11     Q.   Were you driving the car at this point?

12     A.   No.

13     Q.   Why not?

14     A.   Because I felt the car was going to stop

15   running.  It would physically break.

16     Q.   Because of the lack of oil?

17     A.   Yes.

18     Q.   Are you seeking a return of your $2,000 down

19   payment that you paid to Mr. Winer?

20     A.   Yes.

21     Q.   And are you seeking in the lawsuit the one

22   payment -- let me back up.  Did you make any payments to

23   United Consumer Finance?

24     A.   Yes.

25     Q.   Was it for the full amount of the monthly

1   payment as stated on Exhibit 3?

2        A.   Yes.

3        Q.   $319.74?

4        A.   Yes.

5        Q.   And are you seeking in this lawsuit

6   reimbursement on $132.89 that you paid to Dan Perkins?

7        A.   Yes.

8        Q.   You are claiming statutory damages and attorney

9   fees in this case?

10       A.   Yes.

11       Q.   Now, there was partial settlement with United

12   Consumer Finance in this case, correct?

13       A.   Yes.

14       Q.   And what was the amount of that settlement --

15   actually let me ask you.  Is Exhibit 11 a copy of the

16   settlement agreement with United Consumer Finance?

17       A.   What was that?

18       Q.   Exhibit 11?

19       A.   Okay.

20       Q.   Is that a true copy of the settlement agreement

21   with United Consumer Finance?

22       A.   Yes.

23       Q.   And of the $2,000 paid, how much did you

24   receive?

25       A.   About $500.

1      Q.   Was it $400?

2      A.   Yes.

3      Q.   And was 1600 applied to attorney fees?

4      A.   Yes.

5           MR. BLINN:  Your Honor, those are all of my

6      questions on direct for Ms. Negron.

7           THE COURT:  Cross-examination.  Jumping ahead

8      there.

9      CROSS-EXAMINATION BY MS. WINER BECK:

10     Q.   Good morning.

11     A.   Good morning.

12     Q.   I have some questions for you.  Ms. Negron, you

13     wanted to the buy the vehicle from Mr. Winer and Patriot

14     Auto Sales, correct?

15     A.   I wanted to what?

16     Q.   You wanted to buy the car, correct?

17     A.   Yes.

18     Q.   You wanted to get a car loan to buy the car?

19     A.   Yes.

20     Q.   And you needed to sign a Retail Installment

21     Contract in order to finance the car, correct?

22     A.   What do you mean?

23     Q.   How could you get a loan to buy a car if you

24     didn't sign the Retail Installment Agreement?

25     A.   I don't know.

1        Q.   You know in this complaint you have made no

2    allegations for forgery in your complaint for the Retail

3    Installment Agreement, correct?

4        A.   What do you mean?

5        Q.   Have you looked at the amended complaint for the

6    lawsuit that you filed against Mr. Winer?

7        A.   Yes.

8        Q.   Have you read that?  And in it if I can just

9    have one moment, Your Honor.  Do you have the amended

10   complaint there in your papers?  The plaintiff's amended

11   complaint.  If I can turn your attention.  Do you have it

12   there?  The amended complaint?

13       A.   I think it is this.  I'm not sure.

14           THE COURT:  You have to speak up if you are

15   trying to communicate.  Do you have the amended

16   complaint?  Excuse me, counsel.  I'm speaking to the

17   witness.  You are directing her attention to you.

18   Therefore, she won't hear me.  When she asks you if you

19   have it, which I doubt very much that you do, you have to

20   tell her yes or no, then I will know whether to allow her

21   to approach and show her something which your lawyer

22   might want to look at before she shows it to you.  He

23   might not want to look at it.  There's a procedure.

24           The first thing is I need to get an answer to

25   her question.  Do you have the amended complaint?

1          THE WITNESS:  No.

2          THE COURT:  That's what I thought.

3          So would you like to show the amended complaint

4     to the witness?

5          MS. WINER BECK:  I want to ask her a question

6     before I show it.

7          THE COURT:  That's fine, too.

8          I thought we were asking a question first.

9          MS. WINER BECK:  May I approach, Your Honor?

10          THE COURT:  You may, yes.

11          MS. WINER BECK:  Thank you.

12     BY MS. WINER BECK:

13     Q.   On or about November 8, 2016, Winer met the

14     plaintiffs at their home to obtain their signatures on

15     the Retail Installment Contract.  That listed the

16     plaintiffs as the buyers and Patriot Auto Sales as the

17     sellers.  Are you familiar with that portion of your

18     amended complaint?

19     A.   Not sure.  No.  I don't think so.

20     Q.   I want to show it to you.  If you can read that.

21          MS. WINER BECK:  May I approach, your Honor?

22          THE COURT:  You are already there, ma'am, and

23     you have asked a question which really should be using

24     the microphone so next time if you have a preliminary

25     question prior to showing her a document, if you ask it

```
 1    from the podium, then you show it to her.  You are there.

 2    You asked it.  I assume the reporter has gotten it.

 3    Would you look at the amended complaint as she's asked

 4    you to.  Could you tell me, Counsellor, what paragraph

 5    you are referring to?

 6          MS. WINER BECK:  Paragraph 23 of the amended

 7    complaint dated October 26, 2017.

 8          THE COURT:  I just asked for the paragraph.

 9    Thank you.

10    BY MS. WINER BECK:

11       Q.   In your complaint, you admit that you signed a

12    Retail Installment Contract, correct?

13       A.   Yes.

14       Q.   And that's the very same complaint that your

15    lawyer went through -- if I can have a moment, Your

16    Honor.  Plaintiff's Exhibit 3.

17          You signed the Retail Installment Contract?

18       A.   No.

19       Q.   You don't allege forgery.  This is the judicial

20    admission on paragraph 23.

21          THE COURT:  Excuse me, counsel.  You need to ask

22    a question.  Not make declaration of law in questioning

23    the witness.

24          MS. WINER BECK:  Okay.

25    BY MS. WINER-BECK:
```

1      Q.   Is it true that on or about November 8, 2016,

2    that Winer met you, the plaintiffs, at your home to

3    obtain signatures on the Retail Installment Contract?

4      A.   Yes.

5      Q.   That listed the plaintiffs as the buyers meaning

6    you and the Patriot Auto Sales as the creditor seller; is

7    that correct?

8      A.   Yes.

9      Q.   This is your complaint, correct, your amended

10   complaint.  Did your lawyer ever show you this document?

11     A.   Yes.

12     Q.   So your position is that paragraph 23 that you

13   signed the Retail Installment Contract, correct?

14     A.   Yes.

15     Q.   That's what you put in your pleading?

16     A.   Yes.

17     Q.   But you are in court now saying that parts of it

18   were forged?

19     A.   Yes.

20     Q.   You don't allege forgery in your complaint,

21   correct?

22     A.   I guess not.

23     Q.   Just a minute.  You signed the Purchase Order

24   October 27, 2016, Plaintiff's Exhibit 2, correct?

25     A.   Yes.

1      Q.   Now, in that purchase order, it shows a price

2  for the car of $8995, correct?

3      A.   Yes.

4      Q.   And you signed that, correct?

5      A.   Yes.

6      Q.   So you knew the price was $8995 when you signed

7  that?

8      A.   No.

9      Q.   But you signed it, correct?

10     A.   Yes.

11     Q.   Did you read it?

12     A.   No.

13     Q.   Why didn't you read it, if you signed it?

14     A.   Because I trusted Jason.

15     Q.   Do you realize the responsibility of reading

16  documents before you sign that?  Do you understand?

17     A.   Yeah, I understand.

18     Q.   You got the vehicle on November 8, 2016,

19  correct?

20     A.   I know it was in November, yes.

21     Q.   And then -- excuse me.

22          THE COURT:  Why don't you take the exhibits you

23  wish to use to the podium, so there won't be this delay

24  exhibit by exhibit.

25          MS. WINER BECK:  Thank you.  Much easier.

1    BY MS. WINER BECK:

2        Q.   You brought the vehicle to Dan Perkins Subaru on

3    November 30, 2016?

4        A.   Yes.

5        Q.   So from November 8, 2016, to November 30, 2016,

6    you put about 4206 miles on the vehicle, correct?

7        A.   I'm not sure.

8        Q.   You are not sure?

9        A.   No.

10       Q.   4206 miles.  You don't know if you put that on

11   the vehicle?

12       A.   No.  I didn't drive the vehicle.

13       Q.   Okay.  Just a moment.  Dan Perkins?

14            MR. BLINN:  May I see what the witness is being

15   shown?

16            THE COURT:  Yes.  If you can identify it or let

17   counsel see it please.  Let the record reflect what you

18   are showing or something.

19       Q.   I'm going to be showing you Plaintiff's Exhibit

20   3 which you have the Retail Installment Contract.

21            THE COURT:  Thank you.

22            MS. WINER BECK:  She has that there.

23            THE COURT:  I think you do have Exhibit 3.

24   That's one of your exhibits, ma'am, if you can find it.

25   It is the Retail Installment Contract that you covered

```
 1    with your own lawyer on direct examination.

 2    BY MS. WINER-BECK:

 3        Q.   Do you have it?

 4        A.   Yes.

 5        Q.   I'm going to turn your attention to the first

 6    page of this.  Page one of six.

 7        A.   Okay.

 8        Q.   If you can go down to where it says description

 9    of property?

10        A.   Okay.

11        Q.   There's the odometer mileage?

12        A.   Yes.

13        Q.   Can you read the mileage on that?

14        A.   142211.

15        Q.   Do you understand that's the mileage, correct?

16        A.   Yes.

17        Q.   And this document is from November 8, correct,

18    or 11-3 is the date of the document.  Okay?

19        A.   Yes.

20        Q.   I want to turn your attention to your exhibit

21    for the Dan Perkins, Plaintiff's Exhibit 8, the Dan

22    Perkins receipt?

23        A.   Yes.

24        Q.   This is your receipt, correct?

25        A.   Yes.
```

1      Q.   You submitted this for the services that you had

2  at Dan Perkins, correct?

3      A.   Yes.

4      Q.   I want to direct your attention to where it says

5  mileage in and out.  May I approach, Your Honor?

6          THE COURT:  Yes, you may.

7  BY MS. WINER-BECK:

8      Q.   Do you have the document?  What does it say for

9  mileage in?

10     A.   146417.

11     Q.   What does the mileage out say?

12     A.   146418.

13     Q.   This is your document, correct?

14     A.   Yes.

15     Q.   Would you agree that's about 4200 miles?

16     A.   Yeah.

17     Q.   That you put on from the time you picked up the

18  vehicle until you brought it to Dan Perkins.  Where did

19  you go?

20     A.   Just work.

21     Q.   Work?

22     A.   Yeah.

23     Q.   Okay.  4200 miles in 22 days?

24     A.   I guess so.

25     Q.   You guess so or you know so?

1      A.   I know so.

2      Q.   Did you go on a road trip with the vehicle?

3      A.   No.

4      Q.   Did you go to Florida with the vehicle?

5      A.   No.

6      Q.   Did you go to the movies with the vehicle?

7      A.   No.

8      Q.   Did you go grocery shopping?

9      A.   No.

10     Q.   Did you go to the mall?

11     A.   No.

12     Q.   Did you drive friends in it?

13     A.   No.

14     Q.   Where did you go?

15     A.   Just work.

16     Q.   Where do you work?

17     A.   I worked in Greenwich at the time.

18     Q.   4200 miles.  How much oil did you put in the

19  vehicle?

20     A.   About five liters, five liters, five quarts.

21     Q.   Do you have receipts for the oil?

22     A.   No.

23     Q.   What kind of oil did you use?

24     A.   The oil Subaru requires 5w/30 I'm guessing.

25     Q.   How much did you pay for a quart of oil?

1    A.    I don't know.

2    Q.    You don't know?

3    A.    No.

4    Q.    Is it your position that you never brought the

5  vehicle to Mr. Winer to let him fix any defects in it?

6    A.    What's the question?

7    Q.    You never brought the vehicle to Mr. Winer to

8  fix any defects in the vehicle?

9    A.    He never asked me to bring the car down.

10   Q.    Did you bring it down there to give him a

11 chance?

12   A.    No.

13   Q.    Did you bring it down there yourself?

14   A.    No.

15   Q.    So he never had a chance to fix the vehicle?

16   A.    He had a chance.

17   Q.    You brought the vehicle to him to give him a

18 chance?

19   A.    No.  He never asked me to bring down the

20 vehicle.

21   Q.    He never asked you?

22   A.    No.

23   Q.    And you never brought it down?

24   A.    No.

25   Q.    So you didn't give him a chance to fix it?

1          THE COURT:  You are repeating your questions and

2     being argumentative.  You are allowed to ask

3     cross-examination, but you are not allowed to argue with

4     the witness.

5     BY MS. WINER BECK:

6          Q.   Is it your position you made one car payment?

7          A.   Yes.

8          Q.   And how much was that car payment?

9          A.   About $320.

10         Q.   Now, you had the vehicle November of 2016 until

11    April of 2017 and that whole time you made one car

12    payment?

13         A.   Yeah.

14         Q.   Is it your position before you revoked

15    acceptance through your lawyer, that you held the car

16    four months, the March 9 letter.  Is that your position?

17         A.   I'm not sure when the bank picked up the car.

18         Q.   I would like to turn your attention to

19    Plaintiff's Exhibit 9, the Consumer Law Group March 9,

20    2017.  Consumer Law Group letter?

21         A.   Okay.

22         Q.   This is your document, correct?

23         A.   Yes.

24         Q.   And this is a letter that your lawyer wrote to

25    Patriot Auto and United Consumer Finance?

```
 1              THE COURT:  I will appreciate if you can stay by
 2    a microphone.  It is very hard to hear in the courtroom.
 3              MS. WINER BECK:  Sorry, Your Honor.
 4    BY MS. WINER BECK:
 5         Q.   Is this the revocation letter that you sent to
 6    UCF through your lawyer?
 7         A.   Yes.
 8         Q.   So you held the car five months.  Four to five
 9    months before you revoked acceptance through this letter,
10    correct?
11         A.   Yes.
12         Q.   You drove it 4200 miles?
13         A.   I guess so.  Yes.
14         Q.   So you held the car -- I think she answered this
15    already.  You held the car four to five months before you
16    revoked acceptance, correct?
17         A.   Yes.
18         Q.   I would like to turn your attention to
19    Plaintiff's Exhibit 5, the indirect consumer loan
20    application.
21         A.   Okay.
22         Q.   Did you sign this document?
23         A.   No.
24         Q.   Did you sign a credit application to buy the
25    vehicle?
```

```
 1        A.    Credit application or this document?

 2        Q.    This document the credit application.

 3              THE COURT:  I'm sorry.  I'm confused.

 4              MR. BLINN:  Objection.  That question is

 5   confusing.

 6              THE COURT:  If you can refer to a document by

 7   its exhibit number, it makes clear to everyone what you

 8   are talking about.  With this document, doesn't tell me

 9   that.

10              MS. WINER BECK:  I will rephrase the question,

11   Your Honor.  Thank you.

12   BY MS. WINER-BECK:

13        Q.    Plaintiff's Exhibit 5 do you have that?

14        A.    Yes.

15        Q.    The indirect consumer loan application.  Did you

16   sign this document?

17        A.    No.

18        Q.    Did you ever testify in an earlier proceeding

19   that you did sign this document?

20        A.    I don't remember.

21        Q.    I'm going -- do you recall we had a deposition

22   together?  You came to my office and I took your

23   deposition with Attorney Mahoney.

24        A.    Yes.

25        Q.    At that time, I asked you a question about this
```

1    document.  Do you recall?

2        A.   No.

3        Q.   Just a moment.  Isn't it true that you testified

4    at an earlier proceeding that you signed this document?

5    Do you recall?

6        A.   No.

7        Q.   May I approach, Your Honor?  I'm going to show

8    the deposition that was taken at my office.

9            THE COURT:  What's your purpose in showing the

10   witness the document?

11           MS. WINER BECK:  I'm going to show that this

12   document, if I can turn her attention to when you went --

13   I asked you a question.

14           THE COURT:  Excuse me.  I have asked you a

15   question and you haven't answered.  I asked you what's

16   your purpose in showing her the document.

17           MS. WINER BECK:  That she testified in an

18   earlier proceeding as a prior inconsistent statement that

19   she did sign this.

20           THE COURT:  The answer would be you are trying

21   to impeach her.  Okay.

22           MS. WINER BECK:  Thank you.  Yes.

23           THE COURT:  You don't need to show her the

24   document.  You need to read the question and the answer

25   and ask her if she was asked that question and gave that

1    answer.  If she then doesn't recall, you can show her the

2    transcript to refresh her recollection.

3         MS. WINER BECK:  Thank you.

4    BY MS. WINER-BECK:

5         Q.   I asked you a question.  When you went for the

6    loan, did you fill out a consumer loan application to get

7    this loan?

8         A.   Yes.

9         Q.   And then I showed you the consumer loan

10   application which was I had shown you this application,

11   marked Exhibit 6, so you filled out a consumer loan

12   application?

13        MR. BLINN:  Objection, Your Honor.  She

14   interjected her own statement about what happened in the

15   deposition without --

16        THE COURT:  You get to read the transcript of

17   the deposition, question, whatever it is, answer and you

18   are asking the witness.

19        MS. WINER BECK:  I'm not asking.

20        THE COURT:  Then you can't do anything.  All you

21   get to do as a lawyer when a witness is on the stand, is

22   to ask questions.  So if you are not asking her a

23   question, I don't know what you are doing.  The question

24   would go were you asked this question and did you give

25   this answer at the deposition you gave.  And then you

1    read it.  And then she answers yes or no or I don't

2    remember.

3    BY MS. WINER BECK:

4        Q.   Okay.  I asked you when you went for the loan,

5    did you fill out a consumer loan application?

6        A.   Yes.

7             THE COURT:  She's answering your question today.

8    You have to ask an impeachment by deposition question in

9    a certain way that I have demonstrated to you already

10   twice.  But you seem like you don't want to do it that

11   way.  She's just answering your question did she come to

12   the courthouse today?  Yes.  She's saying yes, I came to

13   the courthouse.  Yes, she filled out an application.

14   She's not responding to were you asked a question and did

15   you give this answer previously at the deposition because

16   you are not asking her that.

17   BY MS. WINER BECK:

18       Q.   When I asked you the question, did you tell me

19   you filled out the consumer loan application for the

20   credit record to get a loan and you said yes.  You said

21   that at your deposition that you filled out, yes.  You

22   filled this one out.  It was dated 10-27-16.  That's your

23   signature.  You said yes.

24            Do you recall saying that to me at this

25   deposition?

1      A.   I don't remember.

2           MS. WINER BECK:  May I approach?

3           THE COURT:  You may.

4    BY MS. WINER BECK:

5      Q.   Here's the question when you went for the loan

6    application, did you fill out the consumer loan

7    application to get this loan.  You said yes.  I showed

8    you the consumer loan application you filled out.

9           MR. BLINN:  Objection.  She's not reading from

10   the transcript.

11          THE COURT:  I Agree.  Sustained.  It is not a

12   proper way to refresh recollection which is all that you

13   are allowed to do.

14          MS. WINER BECK:  Do you recall making this

15   statement?

16          THE COURT:  You have asked that and she answered

17   she doesn't recall.  That's why you're up there trying to

18   refresh her recollection.  I presume that's why you are

19   up there trying to refresh her recollection.  You do that

20   by showing it to her.  Directing her to a line and asking

21   her to read it.  Once she's read it, you take it away

22   from her and then you ask does that refresh your

23   recollection that I asked this question and you gave this

24   answer.

25          MS. WINER BECK:  May I approach?

 1          THE COURT:  You are already there, ma'am.

 2   BY MS. WINER BECK:

 3      Q.   Okay.  Can you just read this document?

 4      A.   Yes.

 5          THE COURT:  You need to make a record of what

 6   you are directing her attention to.

 7          MS. WINER BECK:  I'm directing her attention to

 8   page 25 of her deposition.

 9          THE COURT:  Great.

10          So you should read that to yourself, Ms. Negron.

11   When you are done, give it back to counsel.

12      A.   Okay.

13   BY MS. WINER BECK:

14      Q.   Do you recall making this statement that you

15   signed the consumer loan application in my office at this

16   deposition?

17      A.   Yes.

18      Q.   You did say you signed it?

19      A.   Yes.

20      Q.   But you are saying in court that you didn't sign

21   it?

22      A.   Yes.

23      Q.   So you would agree that you said you signed it

24   in my office that you actually signed this document so

25   you lied?

1          MR. BLINN:  Your Honor, objection.

2          THE COURT:  Sustained.

3          MR. BLINN:  The document --

4          THE COURT:  Sustained.  Sustained.  You're

5   arguing with the witness.  You have established that she

6   gave one testimony previously and a different testimony

7   today.  That's it.  Leave it.

8          MS. WINER BECK:  Okay.  We'll move on.

9          THE COURT:  You think?

10         MS. WINER BECK:  Yes.

11         THE COURT:  Yeah.

12   BY MS. WINER BECK:

13     Q.   Now, the Facebook page that you came in on the

14   advertisement was for Brendan Smith's Facebook, correct?

15     A.   Yes.

16     Q.   Not from the Jason Winer or Patriot Auto Sales,

17   correct?

18     A.   Yes.

19     Q.   The lender UCF agreed to let you out of the car

20   loan, correct?

21     A.   Yes.

22     Q.   And UCF even took the loan off your credit

23   report, correct?

24     A.   Yes.

25     Q.   And the lender UCF gave $2,000 as part of the

1   settlement, correct?

2       A.   Yes.

3       Q.   Did you know that UCF was going to take a

4   payment for the car automatically from your checking

5   account?

6       A.   No.

7       Q.   You did agree to let them take that payment,

8   correct?

9       A.   No.

10      Q.   How did they get it if they didn't take it?

11      A.   They had access to my bank account.

12      Q.   You didn't tell your bank not to let them take

13  the 300 something whatever it was?

14      A.   You mean 19?

15      Q.   319?

16      A.   No.

17      Q.   You paid it actually?

18      A.   Yeah.

19      Q.   So that you weren't harmed when the UCF took

20  that money for one payment on the car loan the whole time

21  you had it, correct?

22      A.   Yes.

23           THE COURT:  I didn't understand your question.

24  Could you restate your question?

25      Q.   You only made one car payment, correct?

1      A.    Yes.

2      Q.    How were you injured if you drove the car 4200

3  miles and only made one car payment in five months?

4      A.    Yeah.

5      Q.    So you weren't injured then, correct?

6      A.    So I wasn't what?

7      Q.    You weren't injured if you only made one car

8  payment?

9            MR. BLINN:  Objection.  Asks for a legal

10  conclusion.

11           MS. WINER BECK:  The question is withdrawn.

12           Just a minute.  I have no further questions for

13  this witness.

14           THE COURT:  Brief redirect, Mr. Blinn?

15           MR. BLINN:  Yes, Your Honor.

16  REDIRECT-EXAMINATION BY MR. BLINN:

17      Q.    Just one second, Your Honor.  Ms. Negron,

18  turning to Exhibit 35, the Indirect Consumer Loan

19  Application.  I will ask you, as you look at this now, is

20  that your signature on Exhibit 5?

21      A.    No.

22      Q.    And with respect to repairing the car, you

23  talked about a lot of telephone conversation you had with

24  Mr. Winer after you got delivery of the car.  Did you

25  ever ask him if he would fix it?

1     A.   Yes.

2     Q.   When did you ask that?

3     A.   I think right after I found out the car, you

4  know, was missing oil.  That was my first thought.

5     Q.   And did he offer to fix it?

6     A.   Not immediately.

7     Q.   But did he later say that he would?

8     A.   Yes.

9     Q.   Why didn't you bring it to him?

10    A.   We never.  We never discussed where I would be

11  bringing the car to get fixed.

12    Q.   There's a physical location at Patriot Auto

13  Sales, is there not?

14    A.   Yes.

15    Q.   Why didn't you drop it off there?

16    A.   Just didn't think to just go there and leave the

17  car there.

18    Q.   Did you have an understanding of whether Mr.

19  Winer was always at Patriot Auto Sales during the

20  workday?

21    A.   No.

22    Q.   You didn't have discussions about him whether he

23  was there all the time?

24    A.   No.

25    Q.   And when did you ever try to make arrangements

1    to have him fix the car?

2         A.    Yes.

3         Q.    And when was that?

4         A.    Just again right after I found out the car had

5    no oil.  That's why I was calling.

6         Q.    Right.  And you testified about a lot of times

7    when calls were not being returned.  About how many times

8    did you try to call Mr. Winer without being able to reach

9    him?

10        A.    A lot of times.

11        Q.    How many is a lot?

12        A.    I don't know.  Probably every day in a month to

13   be honest or texted.

14        Q.    Texts.  Would it be more than 30 times?

15        A.    Yeah.

16        Q.    And how many times were you actually able to

17   speak with him?

18        A.    Probably like five.

19        Q.    And during those five conversations, why didn't

20   you just say, what date can I bring it over for repairs?

21        A.    Because he would always tell me he would get

22   back to me about where I would be bringing the car to or

23   what day I would be bringing it down.

24        Q.    If he were willing to repair it, would you have

25   brought it to him for repairs?

1    A.   Yes.

2    Q.   Did you ask him to do that?

3    A.   Yes.

4    Q.   And did he ever say yes, bring it over?

5    A.   No.

6         MR. BLINN:  No more redirect, Your Honor.

7         THE COURT:  You may step down, ma'am.  Your next

8    witness.

9         MR. BLINN:  My next witness is Francisco Negron.

10        THE COURT:  Mr. Negron, if you would come to the

11   witness stand.

12                   FRANCISCO NEGRON

13   Having been called as a witness, was first duly sworn and

14           testified on his/her oath as follows:

15        THE WITNESS:  Yes.

16        THE CLERK:  Please state your name and city and

17   state of residence.

18        THE WITNESS:  Francisco Negron.  Derby,

19   Connecticut.

20        THE COURT:  You may seated now, Mr. Negron.

21   Whenever you are ready, sir.

22        MR. BLINN:  Thank you, Your Honor.

23   DIRECT EXAMINATION BY MR. BLINN:

24     Q.   Mr. Negron, you have the stack of exhibits in

25   front of you?

1    A.    Yes.

2    Q.    Now, did you agree to co-sign for this car for

3  your sister?

4    A.    Yes, I did.

5    Q.    Why did you do that?

6    A.    It is my sister.

7    Q.    And did you have any expectation that you were

8  going to be making the payments on the car?

9    A.    No.  I knew she was responsible enough to do it.

10   Q.    And your sister testified about the execution of

11 contract documents.  Do you remember that?

12   A.    No.  When?

13   Q.    Let me ask you this.  Did Mr. Winer come to your

14 home for purposes of having you sign some documents?

15   A.    Yes.

16   Q.    Okay.  And did you sign some documents?

17   A.    Yes.

18   Q.    Where were you when you signed the documents?

19   A.    When I signed the documents, my sister went to

20 go get me from inside the house to come outside to sign

21 some paperwork.

22   Q.    And did you go into his car?

23   A.    Yes.

24   Q.    And did you sign the documents in his car?

25   A.    Yes.

1      Q.    Did you look at them?

2      A.    No.

3      Q.    Did Mr. Winer direct you where to sign?

4      A.    No.  Well, he pointed to where I need to sign

5  and that's it.

6      Q.    He said sign here which you did?

7      A.    Yes, right there, right there and that's it.

8      Q.    Why didn't you look at the documents?

9      A.    I trusted what I needed to like sign from David

10  and my sister was right there.  She signed this.  I

11  signed that as well.

12      Q.    And how long did the whole process take?

13      A.    A few minutes.

14      Q.    Were you given a copy of what you signed at the

15  time?

16      A.    No.

17      Q.    Now, did you pick up the car on behalf of your

18  sister sometime after the signature?

19      A.    Yes, I did.

20      Q.    Tell us about that.

21      A.    Well, my sister Coralys let me know that if I

22  pick up the car and I said yes and it was like a location

23  besides Patriot Auto Sales, so I picked up a car and went

24  home and that was that.

25      Q.    Did you get it at Patriot Auto Sales?

```
 1        A.    No.

 2        Q.    Some other location?

 3        A.    Some other location.

 4        Q.    Where was that?

 5        A.    I'm not sure.  He gave me an address and I went

 6   to the address.  I think it was, I think they also

 7   mentioned there was a facility where the car was getting

 8   oil change or something like that or cleaned up.

 9        Q.    Was this in Bridgeport?

10        A.    Correct.

11        Q.    And did you get -- were you given any papers at

12   the time that you picked up the car?

13        A.    That I recall, no.

14        Q.    And did you bring the car back for your sister?

15        A.    Yes.

16        Q.    Now, have you had an opportunity to review some

17   of the documents in this case to see whether or not the

18   signatures on there were your signatures?

19        A.    I'm sorry.  What was that?

20        Q.    Have you looked at some of the documents in this

21   case to determine whether or not certain signatures that

22   were purportedly made by you were in fact your signature?

23        A.    Yes.

24        Q.    I'm going to show you some of those.  Can you

25   look at Exhibit 3?
```

1      A.   Okay.

2      Q.   I would like you to first look -- Your Honor, if

3 I may approach?

4           THE COURT:  Yes, you may.

5           MR. BLINN:  Thank you.

6 BY MR. BLINN:

7      Q.   I placed to your left page 2 of 5 which the

8 upper right-hand corner of this document was at one point

9 delivered by fax.  In some instances, we have been

10 referring to it as 3 of 6.  Is that your signature under

11 Francisco Negron?

12     A.   Yes.

13     Q.   And take a look at the signature on your right

14 which is on page 3 of 5 of the exhibit or the page 4 of 6

15 going by the facsimile notation.  Is that your signature?

16     A.   Yes.

17     Q.   May I approach again, Your Honor?

18          THE COURT:  Yes.

19 BY MR. BLINN:

20     Q.   Now, I have positioned on your right page 5 of 5

21 or page 5 of 6 going by the fax designation.  And I'm

22 going to ask you to first look at the signatures on the

23 upper right.

24     A.   Okay.

25     Q.   The one right around the middle of the page.

1      A.   Okay.

2      Q.   And is that your signature?

3      A.   Yes.

4      Q.   On the bottom left, is that one your signature?

5      A.   No.

6      Q.   Now, I would like you to next turn to Exhibit 4.

7   And I would like -- do you have Exhibit 4 in front of

8   you?

9      A.   Yes.

10      Q.   And on the left handside about three-quarters of

11   the way down, there's a box that says "as is" in large

12   letters.  Do you see that?

13      A.   Yes.

14      Q.   There's a signature next to "consumer signature"

15   in that box.  Is that your signature there?

16      A.   No.

17      Q.   Could you next turn to Exhibit 5?

18      A.   Okay.

19      Q.   Now, did you provide credit information to Mr.

20   Winer as part of the application process?

21      A.   I don't remember.

22      Q.   And if you take a look in the middle of this

23   page, it has your name?

24      A.   Okay.

25      Q.   And it says the address reached 300 Hawthorne

1    Avenue.  Is that your address?

2        A.    That's my address.

3        Q.    That's your address at the time, correct?

4        A.    Correct.

5        Q.    It indicates that you were at that residence at

6    that time for three years.  Is that about right?

7        A.    Yes.

8        Q.    And for monthly rent it indicates for monthly

9    amount no rent.  Is that true?

10       A.    That's correct.

11       Q.    You live with your mother?

12       A.    Yes, I do.

13       Q.    Under employment, it reads Adam's Supermarket.

14   Were you employed at Adams Supermarket at the time?

15       A.    Yes.

16       Q.    It says there that the gross monthly income is

17   8,000.

18             Were you making $8,000 a month at that time?

19       A.    No.

20       Q.    How many -- first of all, are you salaried or

21   paid by the hour?

22       A.    I was paid by the hour.

23       Q.    What did do you at Adams?

24       A.    I was minimum wage.

25             THE COURT:  Can you bring the microphone closer?

```
 1        Q.    You said that you make minimum wage?

 2        A.    Yes.  I make minimum wage.

 3        Q.    What was your job there?

 4        A.    I was cashier.

 5        Q.    How many hours would you typically work in a

 6   week?

 7        A.    Roughly 25 to 30.

 8        Q.    So what would be your monthly income on a good

 9   month?

10        A.    Close to $1,500.

11        Q.    Not $8,000 a month?

12        A.    No.

13        Q.    If you take a look under co-applicant, the

14   signature line right over there, is that your signature

15   on this loan application?

16        A.    No.

17              MR. BLINN:  Your Honor, those are all my

18   questions on direct.

19              THE COURT:  Cross-examination, Ms. Winer Beck.

20   CROSS-EXAMINATION BY MS. WINER BECK:

21        Q.    Mr. Negron, do you recall signing a credit

22   application to get this loan?

23        A.    I don't recall.  I don't remember.

24              MS. WINER BECK:  Thank you.

25              THE COURT:  Anything further?
```

1          MS. WINER BECK:  No further questions.

2          MR. BLINN:  No redirect, Your Honor.

3          THE COURT:  You may step down, Mr. Negron.

4    Thank you.

5          MS. WINER BECK:  Your Honor, I was wondering if

6    we can take a recess for like five minutes.

7          THE COURT:  We'll take a five-minute recess.

8    We'll be back in session at 20 minutes to 12.

9    (Whereupon, a recess was taken at 11:36 a.m. to 11:42

10   a.m.)

11         THE COURT:  Any further witnesses, Mr. Blinn?

12         MR. BLINN:  Your Honor, we discussed at the

13   pretrial conference that I did have some questions for

14   Mr. Winer.  But I was going to forgo that and address it

15   on cross-examination if the defendant would agree.

16         THE COURT:  Okay.

17         MS. WINER BECK:  Your Honor, at this time, I do

18   not intend to call the defendant to the stand.

19         THE COURT:  If you want his testimony, you need

20   to call him or if you don't want it, you don't need to

21   call him.

22         MR. BLINN:  I would like to call Mr. Winer.

23         THE COURT:  Mr. Winer, if you would come up here

24   to the witness stand.  When you arrive, if you please

25   remain standing so the clerk can administer an oath.

1              JASON WINER

2    Having been called as a witness, was first duly sworn and

3              testified on his/her oath as follows:

4              THE WITNESS:  Yes, Your Honor.

5              THE CLERK:  Please state your name, spell your

6    last name, city state of residence.

7              THE WITNESS:  Jason Winer, 2370 North Avenue,

8    Bridgeport, Connecticut.

9              THE COURT:  You may be seated.  Good morning to

10   you.  Whenever you are ready, Mr. Blinn.

11             MR. BLINN:  Thank you.

12   DIRECT EXAMINATION BY MR. BLINN:

13      Q.   Good morning, Mr. Winer.

14      A.   Good morning.

15      Q.   Mr. Winer, you have seen the advertisement that

16   was posted by Brendan Smith on Facebook, have you not?

17      A.   Yes.

18      Q.   And Mr. Smith's mother was your girlfriend at

19   the time that he put that on Facebook, correct?

20      A.   Yes.

21      Q.   And she was still your girlfriend at the time

22   that you and I spoke at your deposition in November of

23   2017, correct?

24      A.   Yes.

25      Q.   And you also had originally put that car up on

1    Facebook yourself offering it for sale, correct?

2        A.   Yes.

3        Q.   And you started with Patriot as a salesman in

4    October of 2015, correct?

5        A.   Yes.

6        Q.   Okay.  Now, there's some exhibits that are in

7    front of you.  I would like you to take a look please at

8    Exhibit 10.

9        A.   Yes.

10       Q.   And Exhibit 10 is a funding notification by

11   United Consumer Finance for that transaction, correct?

12       A.   Yes.

13       Q.   That was the company that approved this

14   transaction, correct?

15       A.   Yes.

16       Q.   And the Retail Installment Contract for this car

17   was assigned to United Consumer Finance, correct?

18       A.   That's correct.

19       Q.   And Exhibit 10 reflects an acquisition of

20   $1,800, correct?

21       A.   Correct.

22       Q.   An acquisition fee is an amount that United

23   Consumer Finance charged for purposes of taking

24   assignment of this Retail Installment Contract, correct?

25       A.   That's correct.

1    Q.   And you agree that Ms. Negron paid you $2,000,

2  correct?

3    A.   That's correct.

4         MR. BLINN:  Your Honor, those are all my

5  questions.

6         THE COURT:  All right.  Any cross-examination?

7         MS. WINER BECK:  Just one question.

8  CROSS-EXAMiNATION BY MS. WINER-BECK:

9    Q.   Referring to Plaintiff's Exhibit 10, the funding

10  notification.

11    A.   Yes.

12    Q.   Do you see that in your hand?

13    A.   Yes, I do.

14    Q.   The acquisition fee $1,800.  Do you see that?

15    A.   Yes.

16    Q.   Who paid that?

17    A.   I did.

18         MS. WINER BECK:  Thank you.  No further

19  questions.

20         THE COURT:  Any redirect?

21         MR. BLINN:  No redirect, Your Honor.

22         THE COURT:  You may step down, sir.  Thank you.

23  If I can have one moment please.  Yes, sir.  Anything

24  further?

25         MR. BLINN:  No, Your Honor.  The plaintiff

1    rests.

2              THE COURT:  Are all your exhibits in?  Is that

3    what we agreed at the pretrial conference?

4              MR. BLINN:  We did, Your Honor.

5              MS. WINER BECK:  The defendant rests.

6              THE COURT:  All right.  And your exhibits are

7    also in by way of our discussion at the pretrial

8    conference, are they not?

9              MS. WINER BECK:  Yes, Your Honor.

10             THE COURT:  Just checking.  Trying to make a

11   record.  Not for the record.  All right.  Give me just a

12   moment to see if I have any questions before I lose you

13   all.

14             I guess I have a few questions.  This was really

15   more from my review.  Not so much from the testimony

16   today but looking at your submissions in preparation for

17   the trial as well as the pretrial memorandum.

18             In the pretrial memorandum, it states and I

19   don't know if I can find it quickly, Ms. Winer Beck but

20   I'm pretty sure I'm correct.  You say that you contest

21   jurisdiction.  Is that still your position?

22             MS. WINER BECK:  Yes, Your Honor.  We contested

23   that Jason Winer is not a creditor under the TILA

24   statute.

25             THE COURT:  Okay.  That's fine and if he's not,

1    it would be my view, as a matter of law, that the cause

2    of action under TILA would fail.  But I don't think it is

3    correct that when a defendant contests the ability of a

4    plaintiff to prove an element of the cause of action that

5    that means the Court lacks jurisdiction.  It means the

6    plaintiff has no cause of action.  But I certainly have

7    jurisdiction over TILA causes of action as a general

8    matter, don't I?

9         MS. WINER BECK:  I disagree because the Court is

10   a limited jurisdiction under federal law.

11        THE COURT:  Correct.  One of my limited

12   jurisdiction areas is TILA, is it not, by statute

13   granting a private cause of action to a person involved

14   in a credit transaction which violates some or more than

15   one aspect of the statute known as TILA?

16        MS. WINER BECK:  I agree, Your Honor.

17        THE COURT:  Okay.  I guess you did in the answer

18   to the amended complaint I believe at paragraphs 10

19   through 14 admit allegations made by the plaintiff that

20   Mr. Winer was -- let me get them precisely, so I don't

21   mischaracterize them.  Amended complaints paragraphs 10

22   through 14.  I take that back.  I apologize.  Why don't

23   your admissions or Mr. Winer's admissions at paragraph 10

24   through 14 of the amended complaint provide a basis for

25   the Court to find that Mr. Winer was a merchant?

1          MS. WINER BECK:  Was a what?

2          THE COURT:  Was a merchant.

3          MS. WINER BECK:  We don't dispute he's not a

4  merchant.  We dispute he's a creditor.

5          THE COURT:  That's fine.  Thank you.  For

6  clarification, Attorney Blinn, you have both the breach

7  of warranty and the breach of express warranty.  They

8  seem to be based on the same set of facts or claims.  Is

9  there really any difference between the two or am I

10 missing something?

11         MR. BLINN:  No.  They do arise out of the same

12 facts and condition of the vehicle.

13         THE COURT:  But the same condition of the

14 vehicle I guess.

15         MR. BLINN:  There's an implied warranty in the

16 transaction.  There's also an express statement

17 concerning the condition of the car.

18         THE COURT:  I would ask you to answer their

19 argument, not as a jurisdictional argument, just as a

20 failure of an element of a cause of action.  How Mr.

21 Winer was a creditor.  I have taken a look at the statute

22 and I have looked.  There are not a lot of cases, but

23 other circuits at least the Fourth Circuit I found a case

24 and a couple of district court decisions suggest that you

25 would have to establish he made something more than one

1    transaction.  Have I got the law right?

2          MR. BLINN:  No.  You do have a law right.

3    Initially the initial complaint that allegation that he

4    was a creditor was admitted then there was a denial of

5    that.  And I will concede that we do not have evidence

6    that he engaged in more than 25 finance transactions in

7    2015.  However, I hasten to add, there's also an

8    allegation that Patriot is a creditor.  Patriot is still

9    part of the case.  Patriot has defaulted.

10         THE COURT:  You have that allegation and they

11   admitted it.

12         MR. BLINN:  We did, yes.  The evidence is that

13   Mr. Winer didn't join Patriot until August of 2015.  So

14   he was only there for a third of the relevant period so.

15   It is our position that the allegation, the well pled

16   allegation that Patriot is a creditor seemed to be

17   admitted for purposes of the claim against him.

18         THE COURT:  Actually that's probably going to

19   effect the answer I expected from you and probably be

20   different and that is are the damages attributable

21   assuming that I find that the plaintiff has proven the

22   causes of action and I reach an issue of damages.  If I

23   get there, I'm trying to understand how the damages

24   against Patriot would they be the same as against Mr.

25   Winer or are they different and in what ways would they

1    be different?

2            MR. BLINN:  I think they are the same except for

3    the statutory damages claim under the Truth In Lending

4    Act.  There's a claim against both.  There's two

5    different arguments. One of them is a breach of warranty,

6    revocation of acceptance argument.  The other is the

7    argument for recission for violation of the Retail

8    Installment Sales Finance Act.  But the damages claimed

9    under both are identical.  Essentially it is the money

10   back.

11           THE COURT:  Okay.  And I assume you are going to

12   take -- again I'm asking this because I won't see you

13   folks before I rule.  I'm not going to rule from the

14   bench, so I want to know if I rule for the plaintiffs and

15   I awarded attorney fees, you will avail yourself of the

16   Local Rule to file within 30 days.  I think that's what

17   it is.

18           MR. BLINN:  I thought it was two weeks.

19           THE COURT:  That's what I'm saying.  Don't rely

20   on me.  Whatever the Local Rule provides opposed to today

21   you are not offering evidence?

22           MR. BLINN:  That is correct.  The rule provides

23   to file a motion within a period of time.

24           THE COURT:  That's correct.  I don't remember

25   the time.  If I heard the plaintiff's testimony

1    correctly, Ms. Negron's testimony, she testified

2    obviously nobody is disputing there was $2,000 received

3    in a settlement.  You don't dispute that from the third

4    defendant who has been withdrawn?

5            MR. BLINN:  That's correct.  The testimony was

6    she personally received 400, 1600 was allocated to

7    attorney fees.

8            THE COURT:  So I need to know if had the case

9    proceeded to trial against UCF and not been settled,

10   would the potential damages against UCF be the same as

11   the damages against Mr. Winer and Patriot with the

12   exception of Patriot being perhaps potentially liable

13   under TILA?

14           MR. BLINN:  I made the decision, for better or

15   worse, to rely upon my tablet for certain things and I

16   need to look up the original complaint.  What I have in

17   my notebook is the amended complaint.  There might have

18   been an independent cause of action against the

19   Connecticut Collection Practices Act.  That's what I need

20   to check.  No, Your Honor.  The settlement with UCF was

21   actually prior to litigation.  The liability of UCF was a

22   derivative of the claim against Patriot, right, as the

23   assignee.

24           THE COURT:  Okay.

25           MR. BLINN:  So.  The contract provided that they

```
 1    are subject to all claims and defenses that could have
 2    been raised against them so.
 3             THE COURT:  Give me just one moment.  I wasn't
 4    sure I followed what you said.  You are saying that the
 5    settlement was in April I guess or was prior to your
 6    filing the lawsuit after you sent a demand letter?
 7             MR. BLINN:  Yes, Your Honor.
 8             THE COURT:  So they responded.  You settled with
 9    them.  Then you brought lawsuit against the two
10    defendants in this case?
11             MR. BLINN:  That is correct.
12             THE COURT:  Okay.  Fine.  I think I understand.
13    I don't know whether you wish to add anything either by
14    way of clarification or anything else.  I don't have
15    anymore questions.
16             MR. BLINN:  No, Your Honor.  Unless Your Honor
17    has any questions.
18             THE COURT:  How about you, Ms. Winer Beck?
19    Anything further?
20             MS. WINER BECK:  No, Your Honor.
21             THE COURT:  The Court will take the matter under
22    advisement and expect to issue a ruling in a reasonable
23    period of time.  We're a little busy right now.  I
24    hopefully will get this out promptly.
25    (Whereupon, a recess was taken at 11:59 a.m.)
```

1

2             COURT REPORTER'S TRANSCRIPT CERTIFICATE.

3    I hereby certify that the within and foregoing is a true

4    and correct transcript taken from the proceedings in the

5    above-entitled matter.

6

7    /s/  Terri Fidanza

8    Terri Fidanza, RPR

9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX

 2                        EXAMINATION

 3    Witness Name                                    Page

 4    Coralys Negron

 5       DIRECT EXAMINATION BY MR. BLINN.................... 3

 6       CROSS-EXAMINATION BY MS. WINER-BECK ............... 41

 7       REDIRECT EXAMINATION BY MR. BLINN ................ 62

 8    FRANCISCO NEGRON

 9       DIRECT EXAMINATION BY MR. BLINN.................... 65

10       CROSS-EXAMINATION BY MS. WINER-BECK ............... 72

11    JASON WINER

12       DIRECT EXAMINATION BY MR. BLINN.................... 74

13       CROSS-EXAMINATION BY MS. WINER-BECK ............... 76

14

15

16

17

18

19

20

21

22

23

24

25
```